**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **XAVIAN INSURANCE COMPANY** | § | |
| **AND XAVIAN HOLDINGS, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CASE NO. _____** |
| | § | |
| **BOEING CAPITAL CORPORATION** | § | |
| **AND THE BOEING COMPANY,** | § | |
| | § | |
| **Defendants.** | § | |

_____

## COMPLAINT

_____

Xavian Insurance Company and Xavian Holdings, Inc. (collectively "Xavian"), by their undersigned attorneys, file their Complaint against Defendants Boeing Capital Corporation ("BCC") and The Boeing Company ("Boeing") and respectfully show as follows:

### I.      INTRODUCTION

1.      This case involves trade secrets that truly were ahead of their time.  Defendants Boeing and BCC waited until their need for those trade secrets became critical – and then misappropriated them.

2.      From 2001 through 2015, the Export-Import Bank of the United States ("Ex-Im") provided almost $100 billion in financial support for Boeing's sales of commercial aircraft to foreign airlines with non-investment grade credit ratings.  Beginning in 2006 and continuing for many years, Xavian invested approximately $5 million and countless hours in developing a novel, insurance-based guarantee for commercial aircraft financing with potentially a single-A credit rating from the rating agencies like Standard & Poor's, Moody's, and Fitch.  Among other things,

Xavian's private development effort required identification and collection of expensive, non-public data relating to airline defaults; the direction and completion of an actuarial study defining for the first time the risk of loss for such an insurance-based guarantee for aircraft; lengthy, detailed negotiations with the U.S. rating agencies in private negotiations that resulted in valuable, time-saving insights about how to obtain the necessary credit rating for an insurance-based guarantee; and development of a "Plan B" business model for offering the insurance-based guarantee through a consortium of three to four large insurance companies sharing the risk directly with the deal underwritten and arranged by Xavian's expert underwriting team.

3.     Under the protection of a Proprietary Information Agreement signed in 2007, Xavian shared all of its trade secrets with BCC. For the next four to five years, BCC stayed in close contact with Xavian, asking for and receiving updates on Xavian's progress and developing a very close relationship. Xavian had obtained a financial commitment of up to $375 million from Lightyear Capital ("Lightyear"). BCC had repeatedly promised that Boeing would support Xavian once it reached a "tipping point." The situation changed dramatically in mid-2015, when Boeing and BCC realized that Ex-Im's financial support appeared likely to disappear completely due to lack of Congressional re-authorization. This development threatened Boeing's sales of commercial aircraft compared to rival Airbus, which still had access to an export credit program in Europe.

4.     In June 2015, BCC asked Xavian whether Xavian could resurrect the Xavian insurance-based guarantee (which Xavian had never offered publicly due to the fallout from the financial crisis and Boeing and BCC's tactical decision not to commit to the product). At that point, Boeing and BCC had three options: (a) offer to commit to the Xavian product and facilitate Xavian's final development of its guarantee (which Lightyear had indicated was critical); (b)

otherwise reach agreement with Xavian on reasonable compensation for its trade secrets; or (c) misappropriate Xavian's trade secrets and implement Xavian's "Plan B" business model without Xavian. Boeing and BCC chose the third option.

5.     In June 2017, Boeing announced that it had orchestrated the formation of the Aircraft Finance Insurance Consortium ("AFIC"), a group of four large insurance companies offering the insurance guarantee developed by Xavian. Incredibly, in forming AFIC, Boeing teamed up with insurance broker Marsh & McLennan Companies, Inc. ("Marsh"), which itself had gained complete access to Xavian's trade secrets from a Marsh subsidiary that had agreed to act as Xavian's fiduciary agent in helping Xavian pursue its business model. Boeing and Marsh appointed Xavian shareholder and former Ex-Im employee Bob Morin, a public face of AFIC. Several years earlier, Morin had agreed in principle to become Xavian's Senior Vice President of Marketing, a commitment that allowed him complete access to Xavian's trade secrets, subject to agreements that prohibited him from misappropriating them.

6.     In 2017 and 2018, with Boeing's active participation, AFIC took a victory lap with Xavian's trade secrets, not only reaping enormous profits, but also receiving prestigious insurance and aviation industry awards for the innovative, cutting-edge nature of the "AFIC" concept. AFIC's own public statements and the fact that no AFIC competitor has yet emerged leave no doubt about the proprietary nature of Xavian's trade secrets.

7.     In this lawsuit, Xavian sues Boeing and BCC for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and applicable state trade secret law. The DTSA provides for disgorgement of the profits that Boeing improperly reaped by relying on an insurance-based guarantee that would not have been possible without the misappropriation of

Xavian's trade secrets; recovery of Xavian's lost profits; an alternative reasonable royalty measure of damages; punitive damages; and Xavian's attorneys' fees.

8.      By January 2018, AFIC had issued insurance-based guarantees for approximately $1.5 billion in Boeing commercial aircraft sales. For 2018, Boeing has projected that up to 5% of its commercial aircraft sales will include AFIC's insurance-based guarantee. The sustainable first mover advantage and the substantial barriers to entry will result in even larger numbers in future years. Xavian therefore anticipates that its damages in this case are substantial and will continue to grow.

## II.      PARTIES

9.      Plaintiff Xavian Insurance Company is a Delaware corporation with its principal place of business in Virginia.

10.      Plaintiff Xavian Holdings, Inc., the sole owner of Xavian Insurance Company, is a Delaware corporation with its principal place of business in Virginia.

11.      Defendant BCC is a Delaware corporation with its principal place of business in Washington. BCC may be served with process by serving its registered agent: Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261.

12.      Defendant Boeing is a Delaware corporation with its principal place of business in Chicago, Illinois. Boeing may be served with process by serving its registered agent: Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261.

## III.      JURISDICTION & VENUE

13.      This Court has original jurisdiction over this lawsuit pursuant to 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claim pleaded below pursuant to 28 U.S.C. § 1367(a). Additionally, this Court has original jurisdiction over this dispute pursuant

to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

14.     This is a proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b)(1) because this is the judicial district where Boeing maintains its principal place of business.

## IV.     FACTUAL BACKGROUND

### A.     The Development of Xavian's Trade Secrets.

15.     Traditionally, Boeing and its principal competitor, Airbus, have been heavily dependent on government-backed guarantees by export credit agencies to enable foreign airlines with non-investment grade debt ratings to finance purchases of commercial aircraft. Because airlines have a volatile, capital-intensive business model, subject to geopolitical risk in some cases, a significant percentage of foreign airlines have credit ratings below investment grade.  As a result, in order to induce banks and other lending sources to provide financing for its commercial aircraft sales, Boeing depended on billions of dollars in annual guarantees by Ex-Im, without which traditional lenders either:  (a) would charge extremely high and often prohibitive interest rates intended to compensate for the perceived high risk attributable to the transaction size, certain well-known risks of default, weak airline credit and other factors, or (b) they would refuse to lend.

16.     In an Ex-Im supported transaction, Ex-Im issues a government guarantee to a lender for up to 85% of the net cost of a Boeing aircraft being exported.  If there is a default for any reason whatsoever, including insurance issues or geopolitical issues, Ex-Im pays and effectively takes over the transaction as subrogee.

17.     The export credit agencies of the United States, Europe, and other countries entered into a detailed agreement – the Aircraft Sector Understanding ("ASU") – that governed the nature and extent of the export guarantees and loans that their respective export credit agencies could

provide in support of aircraft transactions. This was intended to preserve competition among the manufacturers and remove export credit agency financing from the relevant governments as a competitive factor.

18.     One of Xavian's founders is Thatcher Stone ("Stone"), a corporate attorney and law school lecturer with decades of experience representing Ex-Im and handling sophisticated, multi-national transactions for billions of dollars of commercial aircraft sales worldwide. Stone began developing the idea for Xavian in 2006. He thought there was an opportunity in the market because future political support for Ex-Im was uncertain and that uncertainty was preventing Ex-Im from meeting certain demands in the market.

19.     In 2007, the international community amended the ASU for the first time in 30 years, limiting the government-backed guarantees for large commercial aircraft to exactly a 12-year term, and creating a more heavily risk-weighted system. These changes were prompted by European concerns about high-profile losses their export credit agency consortium (ECGD, Hermes, and COFACE) had incurred, as well as certain U.S. and European airlines that objected to competitors receiving export credit agency "subsidized" support for foreign airlines' financing of Boeing and Airbus aircraft.

20.     Stone and his co-founder Frank D. Kittredge, Jr. ("Kittredge") officially formed Xavian in 2007 with the goal of providing airlines and airline manufacturers with a more flexible alternative to government-backed guarantees under the ASU. Among other things, Xavian believed that many airlines with non-investment grade credit would prefer longer loan terms that deviated from the uniform 12-year Ex-Im terms and that would preserve their cash and increase profits by requiring lower principal payments than Ex-Im. Xavian also believed that the low loss experience at Ex-Im suggested these foreign carriers were a unique market niche.

21.    Many financial structures existed for commercial aircraft transactions, but Xavian developed a completely new product:  a private, insurance-based guarantee.  The development of this novel insurance product was expensive and time-consuming, in part because no one had ever done an insurance underwriting analysis of the relevant airline financing data, much less formed conclusions about that data that would explain some prior, high profile losses or quantify the varying levels of risk in different segments of the industry.

22.    Xavian also faced the imposing task of persuading U.S. rating agencies in the very conservative, post-financial crisis environment to change their traditional risk models for airline financing.  To provide a credible alternative to a government-backed guarantee, Xavian sought to develop a business model and assemble a management team that, based on private negotiations with U.S. rating agencies, would result in at least a single-A credit rating.  The single-A credit rating would induce lenders to quickly close loans in reliance on Xavian's credit rating, as opposed to transactions with riskier entities that would require delays as the lender performed due diligence, that would require higher interest cost, or that would result in the lender declining to participate in the transaction.  By guaranteeing a lender's transaction with a single-A rated guarantee, interest costs would drop precipitously for a below investment grade foreign carrier.  Xavian's insurance-based guarantee also had the potential to provide an alternative to the financing options that Airbus could provide through an Export Credit Consortium of English, French, and German Export Credit Agencies.

23.    Xavian raised venture capital and spent approximately $5 million to develop the trade secrets necessary to provide the foundation for the very first time for a private, commercial insurance-based guarantee for aircraft financing backed by at least a single-A credit rating.  To preserve its trade secrets, Xavian limits the discussion of its trade secrets in this publicly-available

complaint to a very general description. After an appropriate protective order is entered, Xavian will provide Defendants with Xavian's trade secret designation. At a general level, the trade secrets developed by Xavian include the following:

- Identifying for the first time all relevant non-public data necessary for a full actuarial analysis to evaluate a private, insurance-based guarantee for aircraft financing;

- retaining a world-renowned actuarial firm to perform a full actuarial analysis;

- providing the industry insights and direction necessary to enable the actuarial firm to complete a highly credible analysis;

- retaining additional consultants to provide the actuarial firm and Xavian with the privately collected data and proprietary insights necessary to fully perform the actuarial analysis;

- identifying specific employees at Ex-Im with knowledge, experience, and willingness to join Xavian;

- obtaining necessary Ethics in Government Act clearances for the Ex-Im employees who agreed to join Xavian and maintaining the necessary ethical wall to prevent them from having communications with Boeing;

- entering into extensive, private negotiations with U.S. rating agencies;

- deconstructing and comprehending the highly complex rating models that U.S. rating agencies developed that over-estimated the risk of aircraft financing;

- understanding the similarities and differences between Xavian's actuarial analysis of loss experience and U.S. rating agencies' models;

- through many months of negotiations, identifying the key inputs to the U.S. rating agencies' model that Xavian believed were inconsistent with Xavian's analysis of the actual risk of loss in the airline financing industry;

- establishing credibility with U.S. rating agencies through a fact-based analysis devoid of any concerns about the inherent bias of a manufacturer;

- identifying specific individuals deemed in private analysis by the U.S. rating agencies to be critical to employment by Xavian in obtaining the necessary rating;

- performing the financial modeling to determine the return on investment necessary to attract the necessary capital for a private, insurance-based guarantee;

- developing a business model that could successfully survive post-financial crisis stress testing designed to simulate another financial crisis;

- meeting with airlines to determine exactly what the marketplace desired as an alternative to Ex-Im financing;

- identifying the back-up, or "Plan B," option of implementing the Xavian business model through a consortium of three to four large insurance companies;

- identifying an optimal structure for a consortium of three to four large insurance companies;

- identifying the reinsurance options that would enhance the Xavian business model;

- assembling a management team with deep experience and credibility in the airline financing industry; and

- participating in the private negotiations necessary to establish the U.S. rating agency that would be the best starting point from a ratings perspective.

24.      Xavian's business plan also included hiring Bob Morin, who for many years was the Vice President of the Transportation Division of Ex-Im. Morin and two other Ex-Im employees agreed to join Xavian's executive management team. Specifically, upon the satisfaction of certain conditions, Morin agreed to become Xavian's Senior Vice President of Marketing. Morin signed a Subscription Agreement and non-disclosure agreement with Xavian that required him to preserve and not use Xavian's trade secrets. Based on these agreements, Xavian gave Morin full access to all of Xavian's trade secrets.

25.      In the process of developing its trade secrets, Xavian also established the financial viability of its business model. Xavian raised a total of almost $5 million in two private offerings. Further, in August 2008, Lightyear – a private equity firm founded by Don Marron, the former Chairman of the Board and CEO of PaineWebber – agreed on a term sheet and commitment

to invest $100 million to $125 million in Xavian and to assist Xavian in raising capital of $300 million to $375 million, subject to certain closing conditions. By signing the term sheet and commitment with Lightyear, Xavian also benefited from the advice and counsel of John Shettle ("Shettle"), a Lightyear advisor who had served as a senior executive at several large insurance companies and had substantial industry connections. Shettle later accepted a fiduciary role as Xavian's Chief Executive Officer.

26.     Xavian achieved the condition to closing the Lightyear investment of obtaining written rating agency approval for at least a single-A credit rating, subject to raising enough capital and adopting concentration limits by airline. Xavian also satisfied the condition of agreeing on the employment terms for its executive team. Lightyear's commitment also had a market disruption clause that allowed Lightyear to cancel its commitment if the market for investments in new companies like Xavian faltered. BCC made frequent promises to Xavian that Boeing would support Xavian when it had a financial commitment, a rating, and potential customers – what BCC called the tipping point. The fallout from the financial crisis ultimately prevented Xavian from securing funding from Lightyear, although even a modest commitment from Boeing would have been a game-changing development for Xavian.

27.     Xavian took appropriate measures to protect its trade secrets. Those measures included requiring officers and employees to sign agreements with confidentiality provisions; requiring third parties to enter into non-disclosure agreements; being selective as to how much information to share with third parties; maintaining data on protected computer equipment; and usually requiring execution of an additional release by Xavian's actuarial firm that included Xavian as a third-party beneficiary.

**B.      Xavian and BCC Enter into a Proprietary Information Agreement.**

28.      In September 2007, Xavian and BCC entered into a Proprietary Information Agreement that broadly defined "Proprietary Information" as including "all proprietary, confidential, and/or trade secret information disclosed by either Party to the other and pertaining to business, marketing, operational, and financial matters." Ex. 1 at ¶ 1.  BCC agreed that it would "preserve in confidence, not disclose to others, and not use (except for the purpose set forth in paragraph A of this Agreement) any and all Proprietary Information received" from Xavian. *Id.* at ¶ 2.  The only permissible use of Xavian's Proprietary Information involved BCC and Xavian having discussions with each other about aviation finance, Boeing Customer Finance, ECA Finance and aviation matters in general. *Id.* at ¶ A.

29.      The Proprietary Information Agreement expired after two years, but continued to protect any Proprietary Information disclosed during its term: "Any such expiration or termination, however, will have no effect upon rights or obligations relative to Proprietary Information disclosed to a Party under this Agreement prior to the effective date of such expiration or termination." *Id.* at ¶ 4.

**C.      Under the Protection of the Proprietary Information Agreement, Xavian Shares Its Trade Secrets with BCC.**

30.      Later in September 2007, after execution of the Proprietary Information Agreement, Xavian Co-Founders Stone and Kittredge had an initial meeting with BCC during which two things were made abundantly clear:  (a) BCC had never collected the data necessary to analyze the possibility of a private alternative to Ex-Im, much less done any actuarial work; and (b) BCC had tried in the past without any success to persuade the U.S. rating agencies to change their model for evaluating the risk of loss for aircraft financing.  Indeed, BCC told Xavian that

Xavian would never secure the necessary credit rating from one particular U.S. rating agency, claiming that the key person there did not understand aircraft financing.

31.     Over the next two years, Xavian and Boeing had additional formal and informal meetings and dozens of email exchanges and phone conversations. Under the protection of the Proprietary Information Agreement, Xavian shared all of its trade secrets with BCC, including a detailed business plan with attachments such as Xavian's actuarial work and Xavian's rating agency submission.

32.     In April 2009, after many months of detailed negotiations, Xavian accomplished what BCC had claimed could not be done – it persuaded a major rating agency to significantly change its rating model for aircraft financing, confirming the viability of a single-A rating and providing the detailed path on how Xavian could obtain a double-A or even triple-A credit rating. Importantly, Xavian also disclosed to BCC a "Plan B" business model for offering the Xavian insurance-based guarantee through a consortium of three to four large insurance companies. Indeed, in 2011, Xavian's Shettle shared detailed plans with Boeing about the proposed consortium, and Boeing stated that it would consider an investment in the project of $50 million. Through Xavian's trade secrets, BCC obtained the necessary roadmap to implement a private, insurance-based guarantee for aircraft financing.

33.     Recipients of the Xavian trade secrets included Kostya Zolotusky, BCC's Managing Director of Capital Markets and Leasing; Scott Scherer ("Scherer"), BCC's Vice President and General Manager of Aircraft Financial Services; Tim Myers, BCC's Vice President and Senior Managing Director of Structured Finance (Mr. Myers now is BCC's President); and other BCC executives.

34. Scherer served as the point person for BCC's relationship with Xavian. For the next several years, Scherer showed great enthusiasm and responsiveness about Xavian. He proactively asked Stone about the status of developments. He reached out to Stone about getting together when he visited New York. He made himself available to speak with a large private equity firm that was considering an investment in Xavian, and he provided upcoming aircraft sales data relevant to Xavian's rating agency discussions. The relationship with Scherer and BCC became so close that Xavian even included Scherer on Xavian's "friends and family" updates on company developments. Xavian thought BCC was taking these steps in anticipation of making a commitment to finance Boeing aircraft through Xavian – a commitment that would have ensured Xavian's commercial success.

**D.     Xavian Retains a Marsh Subsidiary as Its Fiduciary Agent to Assist in Pursuit of the Xavian Business Model.**

35. In August 2009, Xavian retained a Marsh subsidiary, Guy Carpenter & Company ("Carpenter"), to act as Xavian's reinsurance intermediary. The contractual arrangement with Carpenter included a provision designating the information provided by Xavian to Carpenter as confidential. As Xavian's reinsurance intermediary, Carpenter would act as Xavian's agent in having discussions with insurance companies about their willingness to provide reinsurance for the Xavian insurance-based guarantee. The very nature of this agency relationship required Carpenter to understand Xavian's entire business model, including Xavian's trade secrets. Carpenter owed fiduciary duties to Xavian within the scope of the parties' agency relationship, including a post-termination duty not to usurp Xavian's trade secrets.

36. By early 2010, Carpenter's agency representation of Xavian had expanded to include the pursuit of a potential third-party investment in Xavian. Carpenter arranged for a meeting between Xavian and high-level executives in the Marsh corporate family because Marsh

was considering selling the Xavian insurance-based guarantee to airlines. Xavian explicitly told Carpenter that the Xavian information provided to Marsh by Carpenter consisted of protected trade secrets. Shettle also helped set up the Marsh meeting. Marsh thus gained access to all of Xavian's trade secrets, but it did so subject not only to a confidentiality provision, but also subject to the stringent fiduciary duties that Carpenter owed to Xavian as Xavian's agent. Significantly, BCC knew about the Xavian/Marsh relationship, because Stone had updated Scherer on Xavian's reinsurance plans, including the fact that Xavian had retained a Marsh subsidiary.

**E.     Boeing's Motive to Steal Xavian's Trade Secrets.**

37.     From 2000 through 2015, Ex-Im provided almost $100 billion in loan guarantees in connection with the sale of Boeing commercial aircraft. Boeing repeatedly warned the market that the lack of availability of Ex-Im financial support could have a material impact on Boeing's sales. Analysts similarly understood that Ex-Im's financial support was critical to Boeing's ability to sell commercial aircraft to foreign airlines with credit ratings below investment grade. While Congressional critics in the United States claimed that Ex-Im's financial support constituted corporate welfare and should be discontinued, Airbus faced no such political uncertainty about the continued support of Europe's equivalent to Ex-Im. The chart below, which is derived from Ex-Im's annual reports, summarizes the financial support that Ex-Im provided for Boeing commercial aircraft sales in the form of both loans and guarantees:



38.     By mid-2015, BCC was acutely aware that Congress planned to eliminate Ex-Im's financial support of Boeing's commercial aircraft sales, thereby threatening to drastically reduce Boeing's sales.   Before 2015, BCC clearly had interest in having Xavian's insurance-based guarantee available to complement Ex-Im's financial support.   The loss of Ex-Im's financial support, however, created a critical need for the Xavian insurance-based guarantee to be available as a complete replacement for billions in annual Ex-Im financial support.   Indeed, by February 2016, Boeing's stock price had dropped precipitously to approximately $108, down from a stock price frequently above $150 throughout 2015.

39.     BCC's Scherer summarized Boeing's state of mind in a June 12, 2015 email to Stone:

        Hi Thatcher,

I hope you are well.

As you know, it looks like Ex-Im's reauthorization will lapse on June 30.

It [sic] Xavian resurrectable?

Best,

Scott

Ex. 2.

40.     During their follow-up telephone conversation, Stone reminded Scherer that Xavian's "Plan B" business plan consisted of offering the Xavian insurance-based guarantee through a consortium of three to four large insurance companies and this could easily be accomplished.  Scherer never followed up after that conversation. Instead, Boeing and BCC secretly decided to resurrect Xavian on their own and as their own.

**F.     Boeing Proactively Uses Xavian's Proprietary Information to Form the AFIC Insurance Consortium.**

41.     In June 2017, Boeing and Marsh announced the formation of AFIC, a consortium of four large insurance companies offering an insurance-based guarantee that was, in fact, developed by and proprietary to Xavian.

42.     Marsh announced that it had hired Morin, who became the public face of AFIC.  At an industry conference in January 2018, Morin stated that AFIC had already provided $1.5 billion in financing for 16 aircraft for four airline clients and one leasing company.  Boeing and Marsh predict further strong growth of AFIC, with Boeing projecting that AFIC will guarantee up to 5% of its commercial aircraft sales in 2018.

43.     Press coverage and Boeing's own public statements suggest that Boeing approached Marsh about creating AFIC.  Without Xavian and the roadmap provided by its trade

secrets, Boeing and BCC would have been unable to do the necessary work to organize and launch AFIC in June 2017. Based on Xavian's dealings with BCC, Xavian concluded that BCC had not collected the necessary data or performed any actuarial work. Further, its past failure to persuade the rating agencies to adjust their aircraft financing risk models showed that BCC did not have the knowledge necessary to direct the actuarial work. Indeed, BCC is not even in the insurance business. In addition, it is certainly not a coincidence that Boeing teamed up with Marsh (an insurance broker that BCC knew had complete access to Xavian's trade secrets through its fiduciary relationship with Xavian); or that Marsh hired Morin (who also had access to all of Xavian's trade secrets, but no permission to use or share those trade secrets).

44. According to Morin, Boeing and Marsh worked together for two years in preparation for the launch of AFIC, approaching approximately 40 different insurance companies about their interest in joining AFIC. Morin also confirmed the critical importance of having the necessary data to enable the insurance companies to evaluate the risk of loss and determine whether to participate in the consortium. Of necessity, the insurance companies would have relied on the data necessary to make presentations to the U.S. rating agencies about how the issuance of guarantees for expensive commercial aircraft potentially would impact their future overall ratings. Without the roadmap provided by Xavian's trade secrets, Boeing and Marsh would not have had sufficient time to do all the work necessary to launch AFIC after just two years (most of which appears to have been spent negotiating with approximately 40 insurance companies – the final step necessary to putting together the consortium of large insurance companies under Xavian's Plan B).

45. The AFIC concept has received a number of industry awards that confirm the proprietary, trade secret nature of Xavian's ideas and analysis:

- The AFIC concept was nominated as a finalist for the 2017 European Risk Management Awards under the category of "Broker Innovation of the Year."

- A company of insurance industry figures called Ishka awarded AFIC as the "Most Innovative Deal 2017" for its use of Xavian's insurance-based guarantees in connection with a jet refinancing for Korea Air. Ishka stated that "We had to recognize this deal as it was exceptional."

- In January 2018, AFIC received Airline Economics' "Editor's Deal of the Year for Innovation" award.

- Also in January 2018, Global Transport Finance awarded AFIC its "Aircraft Finance Unique Leasing Deal of the Year" and "Aircraft Finance Deal of the Year – Asia" awards.

- Airline Economics recognized AFIC for three awards, including the "Deal of the Year for Innovation" for the first insurance-based guarantees, and the "Aviation Finance Person of the Year" for Morin.

- At the 2018 Reaction London Markets Awards, Marsh received the award for "Global Achievement of a London Market Broker" for the AFIC concept.

46.     Industry awards confirm that the concept AFIC stole from Xavian was not generally known in the industry and qualified as a cutting-edge innovation in 2017 and 2018. Boeing not only intentionally misappropriated Xavian's trade secrets to form AFIC, but it has heavily promoted the AFIC concept at industry conferences and to airlines, thereby helping AFIC bask in the industry glory of receiving such prestigious awards touting the innovative and brilliant nature of what are, in fact, Xavian's trade secrets.

47.     AFIC has admitted – in fact, proclaimed – that the insurance-based guarantee it (wrongly) claims as its own is novel and innovative. For example, during a 2018 presentation in Dublin, Ireland, Morin explained that:

> There are probably half a dozen points in developing this product where we said, 'ah ha, that's why this hasn't been done before. But somehow, we figured out a way around those issues or get over those issues, or sometimes through those issues.'

48. Morin also stated that insurers that AFIC approached about the insurance-based guarantee responded to the actuarial data by saying "they couldn't believe it" and "you must be cooking the data, Bob." Yet the AFIC program effectively is Xavian's Plan B.

49. Even though Boeing and Marsh launched AFIC in early June 2017, no competitor has emerged to challenge AFIC. In responding to a question at the Dublin conference about whether a competitor might emerge to offer a similar insurance-based guarantee to Airbus, Morin responded that it was possible, but explained that "this was under development for two years. I mean you people are now seeing sort of like an iceberg. You can see the tip. You don't get to see everything that went on underneath it." Soon thereafter, Marsh announced Project Balthazar, a Marsh-formed consortium offering an insurance-based guarantee for the sale of Airbus aircraft. By misappropriating Xavian's trade secrets, Boeing and Marsh have gained a substantial and sustainable first-mover advantage, with Boeing's ability to refer business to AFIC creating additional barriers to the entry of any potential competitor.

**G.    Xavian's Discovery of Boeing's and BCC's Misconduct.**

50. In June 2016, Xavian learned that an aviation lawyer had requested a conflict waiver to represent Boeing on an insurance-based guarantee matter that would compete with Ex-Im. That was the first hint Xavian received that Boeing and BCC might have misappropriated Xavian's trade secrets. After hearing this news, Stone called Scherer, who had recently retired from BCC. In sharp contrast to their previous dealings, Scherer refused to say anything and told Stone only that he needed to call Kostya (a reference to BCC's Kostya Zolotusky). Stone left voicemails for Mr. Zolotusky, who had received Xavian's trade secrets under the Proprietary Information Agreement and had discussed them with Stone and Kittredge. But despite previous interest and cooperation from BCC, Stone received no response from Mr. Zolotusky. In addition,

at the time, Stone had a friendly relationship with Boeing's general counsel, whom Stone had contacted based on their University of Virginia School of Law connection and frequent conversations about the Ex-Im situation in Congress. Yet Boeing's general counsel failed to return three separate phone calls from Stone, thereby confirming that knowledge of the misappropriation of Xavian's trade secrets had reached the highest levels of Boeing.

## COUNT I

### (Misappropriation of Trade Secrets
### in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

51.     As the factual basis for its allegations, Xavian incorporates the prior paragraphs of its complaint as if set forth fully here.

52.     As described above, the proprietary and confidential information Xavian shared with BCC and Boeing constitute Xavian's "trade secrets" as that term is defined in 18 U.S.C. § 1839(3). Xavian took reasonable measures to keep its proprietary and confidential information secret; and that information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

53.     BCC and Boeing misappropriated Xavian's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets without the express or implied consent of Xavian. Specifically, BCC acquired, disclosed and used Xavian's trade secrets in breach of BCC's contractual duty to Xavian to maintain secrecy in violation of 18 U.S.C. § 1839(5)(A)-(B). For its part, Boeing acquired, disclosed and used Xavian's trade secrets while knowing, or having reason to know, that Boeing learned Xavian's trade secrets though BCC's breach of its contractual duty to Xavian to maintain secrecy in violation of 18 U.S.C. § 1839(5)(B)(ii). Further, under the inevitable disclosure doctrine, a presumption exists that Marsh

and Morin disclosed Xavian's trade secrets to Boeing and BCC. *See Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 195431 at *5 (N.D. Ill. May 11, 2017) (applying inevitable disclosure doctrine to DTSA claim).

54. Moreover, Boeing continues to use the misappropriated trade secrets by selling commercial aircraft in financing transactions relying on the AFIC guarantee and by actively promoting the use of the AFIC guarantee.

55. BCC's and Boeing's misappropriation of Xavian's trade secrets has caused Xavian substantial damages. As remedies for the misappropriation, Xavian seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by 18 U.S.C. § 1836(b)(3)(B)(i). As an alternative to lost profits, Xavian seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for BCC's and Boeing's unauthorized disclosure and use of the trade secret, as authorized by 18 U.S.C. § 1836(b)(3)(B)(ii).

56. Because BCC and Boeing willfully and maliciously misappropriated Xavian's trade secrets, Xavian seeks an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and an award of reasonable attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

WHEREFORE, Plaintiffs, Xavian Insurance Company and Xavian Holdings, Inc., respectfully request that the Court enter judgment in their favor and against Defendants, Boeing Capital Corporation and The Boeing Company, as follows:

a. Awarding Xavian Insurance Company and Xavian Holdings, Inc. actual damages for misappropriation in an amount to be determined at trial;

b.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. unjust enrichment damages for misappropriation in an amount to be determined at trial;

c.      As an alternative to (a) and (b), awarding Xavian Insurance Company and Xavian Holdings, Inc. a reasonable royalty for misappropriation in an amount to be determined at trial;

d.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. their reasonable attorney's fees;

e.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. exemplary damages;

f.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. prejudgment and post-judgment interest as permitted by law;

g.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. their costs; and

h.      Granting such other and further relief that this Court finds just and appropriate.

## COUNT II

### (Misappropriation of Trade Secrets in Violation of the Washington Uniform Trade Secrets Act, Wash. Rev. Code chapter 19.108)

57.     As the factual basis for its allegations, Xavian incorporates the prior paragraphs of its complaint as if set forth fully here.

58.     As described above, the proprietary and confidential information Xavian shared with BCC and Boeing constitute Xavian's "trade secrets" as that term is defined in Revised Code of Washington § 19.108.010(4). Xavian took reasonable measures under the circumstances to keep its proprietary and confidential information secret; and that information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

59.     BCC and Boeing misappropriated Xavian's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets without the express or implied consent of Xavian in violation of Revised Code of Washington § 19.108.010(1)-(2). Specifically, BCC acquired, disclosed and used Xavian's trade secrets in breach of BCC's contractual duty to Xavian to maintain secrecy in violation of Revised Code of Washington § 19.108.010(1) and § 19.108.010(2)(b)(i). For its part, Boeing acquired, disclosed and used Xavian's trade secrets while knowing, or having reason to know, that Boeing learned Xavian's trade secrets through BCC's breach of its contractual duty to Xavian to maintain secrecy in violation of Revised Code of Washington § 19.108-010(2)(b)(ii)(A)-(C). Further, under the inevitable disclosure doctrine, a presumption exists that Marsh and Morin disclosed Xavian's trade secrets to Boeing and BCC.

60.     Moreover, Boeing continues to use the misappropriated trade secrets by selling commercial aircraft in financing transactions relying on the AFIC guarantee and by actively promoting the use of the AFIC guarantee.

61.     BCC's and Boeing's misappropriation of Xavian's trade secrets has caused Xavian substantial damages. As remedies for the misappropriation, Xavian seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by Revised Code of Washington § 19.108.030(1). As an alternative to lost profits, Xavian seeks an award of damages caused by the misappropriation as measured by a reasonable royalty.

62.     Because BCC and Boeing willfully and maliciously misappropriated Xavian's trade secrets, Xavian seeks an award of exemplary damages pursuant to Revised Code of

Washington § 19.108.030(2) and an award of reasonable attorney's fees pursuant to Revised Code of Washington § 19.108.040.

WHEREFORE, Plaintiffs, Xavian Insurance Company and Xavian Holdings, Inc., respectfully request that the Court enter judgment in their favor and against Defendants, Boeing Capital Corporation and The Boeing Company, as follows:

a.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. actual damages for misappropriation in an amount to be determined at trial;

b.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. unjust enrichment damages for misappropriation in an amount to be determined at trial;

c.     As an alternative to (a) and (b), awarding Xavian Insurance Company and Xavian Holdings, Inc. a reasonable royalty for misappropriation in an amount to be determined at trial;

d.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. their reasonable attorney's fees;

e.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. exemplary damages;

f.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. prejudgment and post-judgment interest as permitted by law;

g.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. their costs; and

h.     Granting such other and further relief that this Court finds just and appropriate.

## V.     DISCOVERY RULE

63.     Xavian pleads that the discovery rule applicable to misappropriation claims brought under federal law, 18 U.S.C. § 1836(d), and Washington law, Revised Code of Washington § 19.108.060, applies in this case and that this lawsuit has been brought within three years after the

misappropriation was discovered or by the exercise of reasonable diligence should have been discovered.

## VI.    JURY DEMAND

64.    Xavian demands a trial by jury.

DATED: September 11, 2018        Respectfully submitted,

XAVIAN INSURANCE COMPANY AND
XAVIAN HOLDINGS, INC.

By:   _/s/ Stephen J. Siegel_
       Stephen J. Siegel
       One of Their Attorneys

Stephen J. Siegel (ARDC #6209054)
_ssiegel@novackmacey.com_
Alexander L. Berg (ARDC #6294866)
_aberg@novackmacey.com_
Elizabeth C. Wolicki (ARDC #6297990)
_ewolicki@novackmacey.com_
**NOVACK AND MACEY LLP**
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900 Telephone
(312) 419-6928 Facsimile

Christopher J. Akin (*pro hac vice* forthcoming)
Texas Bar No. 00793237
_cakin@lynnllp.com_
Kent D. Krabill (*pro hac vice* forthcoming)
Texas Bar No. 24060115
_kkrabill@lynnllp.com_
John Volney (*pro hac vice* forthcoming)
Texas Bar No. 24003118
_jvolney@lynnllp.com_
Michael Kalis (*pro hac vice* forthcoming)
Texas Bar No. 24092606)
_mkalis@lynnllp.com_
**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

4841-6212-7470, v. 7

---

**COMPLAINT**