UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| XAVIAN INSURANCE COMPANY and XAVIAN HOLDINGS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:18-cv-06222 |
| v. | ) ) | Judge Thomas M. Durkin |
| BOEING CAPITAL CORPORATION and THE BOEING COMPANY, | ) ) ) | Mag. Judge Susan E. Cox |
| Defendants. | ) ) | |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT

Defendants Boeing Capital Corporation and The Boeing Company (collectively, "Boeing") provide the following answers and affirmative defenses to the Complaint filed by Xavian Insurance Company and Xavian Holdings, Inc. (collectively, "Xavian"). Boeing denies all allegations in the Complaint not specifically admitted below. In responding to the Complaint, Boeing uses the headings employed by Xavian strictly as a convenience to the Court, and does not admit any allegation made in, or inference suggested by, such headings. Boeing answers as follows:

**1.     This case involves trade secrets that truly were ahead of their time. Defendants Boeing and BCC waited until their need for those trade secrets became critical – and then misappropriated them.**

Boeing admits that Xavian is alleging trade secret misappropriation, but denies the remaining allegations and characterizations of paragraph 1.

**2.     From 2001 through 2015, the Export-Import Bank of the United States ("Ex-Im") provided almost $100 billion in financial support for Boeing's sales of commercial aircraft to foreign airlines with non-investment grade credit ratings. Beginning in 2006 and continuing for many years, Xavian invested approximately $5 million and countless hours in developing a novel, insurance-based guarantee for commercial aircraft financing with potentially a single-A credit rating from the rating agencies like Standard & Poor's, Moody's, and Fitch. Among other things, Xavian's private development effort required**

**identification and collection of expensive, non-public data relating to airline defaults; the direction and completion of an actuarial study defining for the first time the risk of loss for such an insurance-based guarantee for aircraft; lengthy, detailed negotiations with the U.S. rating agencies in private negotiations that resulted in valuable, time-saving insights about how to obtain the necessary credit rating for an insurance-based guarantee; and development of a "Plan B" business model for offering the insurance-based guarantee through a consortium of three to four large insurance companies sharing the risk directly with the deal underwritten and arranged by Xavian's expert underwriting team.**

In response to the first sentence of paragraph 2, Boeing admits that the Export-Import Bank of the United States provided financing support to certain purchasers of commercial airplanes manufactured by Boeing, with Ex-Im data on the amount of such support speaking for itself. Boeing denies any remaining allegations in the first sentence of paragraph 2. In response to the remaining sentences of paragraph 2, Boeing is without knowledge sufficient to form a belief as to the truth of the allegations, and therefore denies them.

**3. Under the protection of a Proprietary Information Agreement signed in 2007, Xavian shared all of its trade secrets with BCC. For the next four to five years, BCC stayed in close contact with Xavian, asking for and receiving updates on Xavian's progress and developing a very close relationship. Xavian had obtained a financial commitment of up to $375 million from Lightyear Capital ("Lightyear"). BCC had repeatedly promised that Boeing would support Xavian once it reached a "tipping point." The situation changed dramatically in mid-2015, when Boeing and BCC realized that Ex-Im's financial support appeared likely to disappear completely due to lack of Congressional re-authorization. This development threatened Boeing's sales of commercial aircraft compared to rival Airbus, which still had access to an export credit program in Europe.**

In response to the first sentence of paragraph 3, Boeing admits that Boeing Capital Corporation and Xavian signed a Proprietary Information Agreement in 2007, but denies the remaining allegations in the first sentence of paragraph 3. Boeing denies the allegations in the second sentence of paragraph 3. Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 3, and therefore denies them. Boeing denies the remaining allegations in paragraph 3.

**4.   In June 2015, BCC asked Xavian whether Xavian could resurrect the Xavian Insurance-based guarantee (which Xavian had never offered publicly due to the fallout from the financial crisis and Boeing and BCC's tactical decision not to commit to the product).  At that point, Boeing and BCC had three options: (a) offer to commit to the Xavian product and facilitate Xavian's final development of its guarantee (which Lightyear had indicated was critical); (b) otherwise reach agreement with Xavian on reasonable compensation for its trade secrets; or (c) misappropriate Xavian's trade secrets and implement Xavian's "Plan B" business model without Xavian.  Boeing and BCC chose the third option.**

Boeing denies the allegations in paragraph 4.

**5.     In June 2017, Boeing announced that it had orchestrated the formation of the Aircraft Finance Insurance Consortium ("AFIC"), a group of four large insurance companies offering the insurance guarantee developed by Xavian.  Incredibly, in forming AFIC, Boeing teamed up with insurance broker Marsh & McLennan Companies, Inc. ("Marsh"), which itself had gained complete access to Xavian's trade secrets from a Marsh subsidiary that had agreed to act as Xavian's fiduciary agent in helping Xavian pursue its business model.  Boeing and Marsh appointed Xavian shareholder and former Ex-Im employee Bob Morin, a public face of AFIC.  Several years earlier, Morin had agreed in principle to become Xavian's Senior Vice President of Marketing, a commitment that allowed him complete access to Xavian's trade secrets, subject to agreements that prohibited him from misappropriating them.**

In response to the first sentence of paragraph 5, Boeing asserts that, although Xavian has failed to identify the alleged announcement, any announcement made by Boeing speaks for itself, and denies any allegations inconsistent with any such announcement.  Boeing denies the allegations in the second sentence of paragraph 5, both because it misstates Boeing's role in the formation of AFIC, and because Boeing is without knowledge sufficient to form a belief as to the truth of the allegations regarding Marsh.  Boeing denies the allegations in the third sentence of paragraph 5.  Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 5, and therefore denies them.

**6.     In 2017 and 2018, with Boeing's active participation, AFIC took a victory lap with Xavian's trade secrets, not only reaping enormous profits, but also receiving prestigious insurance and aviation industry awards for the innovative, cutting-edge nature of the "AFIC" concept.  AFIC's own public statements and the fact that no AFIC competitor has yet emerged leave no doubt about the proprietary nature of Xavian's trade secrets.**

Boeing is without knowledge sufficient to form a belief as to whether AFIC "receiv[ed] prestigious insurance and aviation industry awards for the innovative, cutting edge nature of the 'AFIC' concept," and therefore denies that allegation.  Boeing otherwise denies the remaining allegations in paragraph 6.

**7.     In this lawsuit, Xavian sues Boeing and BCC for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and applicable state trade secret law.  The DTSA provides for disgorgement of the profits that Boeing improperly reaped by relying on an insurance-based guarantee that would not have been possible without the misappropriation of Xavian's trade secrets; recovery of Xavian's lost profits; an alternative reasonable royalty measure of damages; punitive damages; and Xavian's attorneys' fees.**

Paragraph 7 sets forth conclusions of law to which no response is required.  To the extent further response is required, Boeing denies the allegations in paragraph 7.

**8.     By January 2018, AFIC had issued insurance-based guarantees for approximately $1.5 billion in Boeing commercial aircraft sales.  For 2018, Boeing has projected that up to 5% of its commercial aircraft sales will include AFIC's insurance-based guarantee.  The sustainable first mover advantage and the substantial barriers to entry will result in even larger numbers in future years.  Xavian therefore anticipates that its damages in this case are substantial and will continue to grow.**

In response to the first two sentences of Paragraph 8, because Xavian does not identify a source for the projections and figures it alleges, and because there are multiple ways to calculate these metrics, Boeing is without knowledge sufficient to form a belief as to the truth of those allegations, and therefore denies them.  Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 8, and therefore denies them. The fourth sentence in paragraph 8 sets forth conclusions of law to which no response is required.  To the extent further response is required, Boeing denies the allegations in the fourth sentence of paragraph 8.

4

## II.     PARTIES

**9.     Plaintiff Xavian Insurance Company is a Delaware corporation with its principal place of business in Virginia.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 9, and therefore denies them.

**10.     Plaintiff Xavian Holdings, Inc., the sole owner of Xavian Insurance Company, is a Delaware corporation with its principal place of business in Virginia.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 10, and therefore denies them.

**11.     Defendant BCC is a Delaware corporation with its principal place of business in Washington.  BCC may be served with process by serving its registered agent: Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261.**

Boeing admits that BCC is a Delaware corporation with its principal place of business in Washington State.  Boeing admits that paragraph 11 accurately identifies a registered agent for BCC.  Boeing denies any remaining allegations in paragraph 11.

**12.     Defendant Boeing is a Delaware corporation with its principal place of business in Chicago, Illinois.  Boeing maybe served with process by serving is registered agent: Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703-4261.**

Boeing admits The Boeing Company is a Delaware corporation with its principal place of business in Chicago, Illinois.  Boeing admits that paragraph 12 accurately identifies a registered agent for The Boeing Company.  Boeing denies any remaining allegations of paragraph 12.

## III.     JURISDICTION & VENUE

**13.     This Court has original jurisdiction over this lawsuit pursuant to 18 U.S.C. § 1836(c).  This Court has supplemental jurisdiction over the state law claim pleaded below pursuant to 28 U.S.C. § 1367(a).  Additionally, this Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.**

The allegations in paragraph 13 of subject matter jurisdiction contain conclusions of law and not averments of facts to which an answer is required.

**14.     This is proper venue for this lawsuit pursuit to 28 U.S.C. § 1391(b)(1) because this is the judicial district where Boeing maintains its principal place of business.**

The allegations in paragraph 14 concerning venue contain conclusions of law and not averments of facts to which an answer is required.

## IV.     FACTUAL BACKGROUND

### A.  The Development of Xavian's [Alleged] Trade Secrets.

**15.     Traditionally, Boeing and its principal competitor, Airbus, have been heavily dependent on government-backed guarantees by export credit agencies to enable foreign airlines with non-investment grade debt ratings to finance purchases of commercial aircraft.  Because airlines have a volatile, capital-intensive business model, subject to geopolitical risk in some cases, a significant percentage of foreign airlines have credit ratings below investment grade.  As a result, in order to induce banks and other lending sources to provide financing for its commercial aircraft sales, Boeing depended on billions of dollars in annual guarantees by Ex-Im, without which traditional lenders either: (a) would charge extremely high and often prohibitive interest rates intended to compensate for the perceived high risk attributable to the transaction size, certain well-known risks of default, weak airline credit and other factors, or (b) they would refuse to lend.**

In response to the allegations in paragraph 15, Boeing admits that export credit agencies, including the Export-Import Bank of the United States, assist foreign airlines in financing purchases of commercial aircraft.  Boeing denies the remaining allegations of paragraph 15.

**16.     In an Ex-Im supported transaction, Ex-Im issues a government guarantee to a lender for up to 85% of the net cost of a Boeing aircraft being exported.  If there is a default for any reason whatsoever, including insurance issues or geopolitical issues, Ex-Im pays and effectively takes over the transaction as subrogee.**

In response to the first sentence of paragraph 16, Boeing admits that the description is one method by which Ex-Im guaranteed financing for a lender.  Boeing denies the allegations in the second sentence of paragraph 16.

**17.     The export credit agencies of the United States, Europe, and other countries entered into a detailed agreement – the Aircraft Sector Understanding ("ASU") – that**

governed the nature and extent of the export guarantees and loans that their respective export credit agencies could provide in support of aircraft transactions. This was intended to preserve competition among the manufacturers and remove export credit agency financing from the relevant governments as a competitive factor.

In response to the first sentence of paragraph 17, Boeing asserts that the ASU speaks for itself, and denies any allegation inconsistent with the ASU. In response to the second sentence of paragraph 17, Boeing is without knowledge sufficient to form a belief as to the truth of the allegations, and therefore denies them.

18. One of Xavian's founders is Thatcher Stone ("Stone"), a corporate attorney and law school lecturer with decades of experience representing Ex-Im and handling sophisticated, multi-national transactions for billions of dollars of commercial aircraft sales worldwide. Stone began developing the idea for Xavian in 2006. He thought there was an opportunity in the market because future political support for Ex-Im was uncertain and that uncertainty was preventing Ex-Im from meeting certain demands in the market.

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 18, and therefore denies them.

19. In 2007, the international community amended the ASU for the first time in 30 years, limiting the government-backed guarantees for large commercial aircraft to exactly a 12-year term, and creating a more heavily risk-weighted system. These changes were prompted by European concerns about high-profile losses their export credit agency consortium (ECGD, Hermes, and COFACE) had incurred, as well as certain U.S. and European airlines that objected to competitors receiving export credit agency "subsidized" support for foreign airlines' financing of Boeing and Airbus aircraft.

In response to the first sentence of paragraph 19, Boeing asserts that the ASU speaks for itself, and denies any allegation inconsistent with the ASU. In response to the second sentence of paragraph 19, Boeing is without knowledge sufficient to form a belief as to the truth of the allegations, and therefore denies them.

20. Stone and his co-founder Frank D. Kittredge, Jr. ("Kittredge") officially formed Xavian in 2007 with the goal of providing airlines and airline manufacturers with a more flexible alternative to government-backed guarantees under the ASU. Among other things, Xavian believed that many airlines with non-investment grade credit would prefer longer loan terms that deviated from the uniform 12-year Ex-Im terms and that would preserve their cash and increase profits by requiring lower principal payments than Ex-Im.

Xavian also believed that the low loss experience at Ex-Im suggested these foreign carriers were a unique market niche.

In response: Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 20, and therefore denies them.

21.     **Many financial structures existed for commercial aircraft transactions, but Xavian developed a completely new product: a private, insurance-based guarantee. The development of this novel insurance product was expensive and time-consuming, in part because no one had ever done an insurance underwriting analysis of the relevant airline financing data, much less formed conclusions about that data that would explain some prior, high profile losses or quantify the varying levels of risk in different segments of the industry.**

In response to the first sentence of paragraph 21, Boeing admits that many financial structures existed for commercial aircraft transactions. Boeing denies the remaining allegations of paragraph 21.

22.     **Xavian also faced the imposing task of persuading U.S. rating agencies in the very conservative, post-financial crisis environment to change their traditional risk models for airline financing. To provide a credible alternative to a government-backed guarantee, Xavian sought to develop a business model and assemble a management team that, based on private negotiations with U.S. rating agencies, would result in at least single-A credit rating. The single-A credit rating would induce lenders to quickly close loans in reliance on Xavian's credit rating, as opposed to transactions with riskier entities that would require delays as the lender performed due diligence, that would require higher interest cost, or that would result in the lender declining to participate in the transaction. By guaranteeing a lender's transaction with a single-A rated guarantee, interest costs would drop precipitously for a below investment grade foreign carrier. Xavian's insurance-based guarantee also had the potential to provide an alternative to the financing options that Airbus could provide through an Export Credit Consortium of English, French, and German Export Credit Agencies.**

In response: Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 22, and therefore denies them.

23.     **Xavian raised venture capital and spent approximately $5 million to develop the trade secrets necessary to provide the foundation for the very first time for a private, commercial insurance-based guarantee for aircraft financing backed by a least a single-A credit rating. To preserve its trade secrets, Xavian limits the discussion of its trade secrets in this publicly-available complaint to a very general description. After an appropriate**

protective order is entered, Xavian will provide Defendants with Xavian's trade secret designation.  At a general level, the trade secrets developed by Xavian include the following:

- **Identifying for the first time all relevant non-public data necessary for a full actuarial analysis to evaluate a private, insurance-based guarantee for aircraft financing;**

- **retaining a world-renowned actuarial firm to perform a full actuarial analysis;**

- **providing the industry insights and direction necessary to enable the actuarial firm to complete a highly credible analysis;**

- **retaining additional consultants to provide the actuarial firm and Xavian with the privately collected data and proprietary insights necessary to fully perform the actuarial analysis;**

- **identifying specific employees at Ex-Im with knowledge, experience and willingness to join Xavian;**

- **obtaining necessary Ethics in Government Act clearances for the Ex-Im employees who agreed to join Xavian and maintaining the necessary ethical wall to prevent them from having communications with Boeing;**

- **entering into extensive, private negotiations with U.S. rating agencies;**

- **deconstructing and comprehending the highly complex rating models that U.S. rating agencies developed that over-estimated the risk of aircraft financing;**

- **understanding the similarities and differences between Xavian's actuarial analysis of loss experience and U.S. rating agencies' models;**

- **through many months of negotiations, identifying the key inputs to the U.S. rating agencies' model that Xavian believed were inconsistent with Xavian's analysis of the actual risk of loss in the airline financing industry;**

- **establishing credibility with U.S. rating agencies through a fact-based analysis devoid of any concerns about the inherent bias of a manufacturer;**

- **identifying specific individuals deemed in private analysis by the U.S. rating agencies to be critical to employment by Xavian in obtaining the necessary rating;**

- **performing the financial modeling to determine the return on investment necessary to attract the necessary capital for a private, insurance-based guarantee;**

- **developing a business model that could successfully survive post-financial crisis stress testing designed to simulate another financial crisis;**

- **meeting with airlines to determine exactly what the marketplace desired as an alternative to Ex-Im financing;**

- **identifying the back-up, or "Plan B," option of implementing the Xavian business model through a consortium of three to four large insurance companies;**

- **identifying an optimal structure for a consortium of three to four large insurance companies;**

- **identifying the reinsurance options that would enhance the Xavian business model;**

- **assembling a management team with deep experience and credibility in the airline financing industry; and**

- **participating in the private negotiations necessary to establish the U.S. rating agency that would be the best starting point from a ratings perspective.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 23, and therefore denies them. Boeing denies the remaining allegations in paragraph 23, and Boeing specifically denies that any of the items listed in paragraph 23 constitute trade secrets or even a "general description" of trade secrets.

**24.     Xavian's business plan also included hiring Bob Morin, who for many years was the Vice President of the Transportation Division of Ex-Im. Specifically, upon the satisfaction of certain conditions, Morin agreed to become Xavian's Senior Vice President of Marketing. Morin signed a Subscription Agreement and non-disclosure agreement with Xavian that required him to preserve and not use Xavian's trade secrets. Based on these agreements, Xavian gave Morin full access to all of Xavian's trade secrets.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 24, and therefore denies them.

10

25.     In the process of developing its trade secrets, Xavian also established the financial viability of its business model.  Xavian raised a total of almost $5 million in two private offerings.  Further, in August 2008, Lightyear – a private equity firm founded by Don Marron, the former Chairman of the Board and CEO of PaineWebber – agreed on a term sheet and commitment to invest $100 million to $125 million in Xavian and to assist Xavian in raising capital of $300 million to $375 million, subject to certain closing conditions.  By signing the term sheet and commitment with Lightyear, Xavian also benefited from the advice and counsel of John Shettle ("Shettle"), a Lightyear advisor who had served as a senior executive at several large insurance companies and had substantial industry connections.  Shettle later accepted a fiduciary role as Xavian's Chief Executive Officer.

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in paragraph 25, and therefore denies them, except that Boeing specifically denies that Xavian's

complaint has identified any trade secrets.

26.     Xavian achieved the condition to closing the Lightyear investment of obtaining written rating agency approval for at least a single-A credit rating, subject to raising enough capital and adopting concentration limits by airline.  Xavian also satisfied the condition of agreeing on the employment terms for its executive team.  Lightyear's commitment also had a market disruption clause that allowed Lightyear to cancel its commitment if the market for investments in new companies like Xavian faltered.  BCC made frequent promises to Xavian that Boeing would support Xavian when it had a financial commitment, a rating, and potential customers – what BCC called the tipping point.  The fallout from the financial crisis ultimately prevented Xavian from securing funding from Lightyear, although even a modest commitment from Boeing would have been a game-changing development for Xavian.

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in the first, second, third, and fifth sentences of paragraph 26, and therefore denies them.  Boeing

denies the allegations in the fourth sentence of paragraph 26.

27.     Xavian took appropriate measures to protect its trade secrets.  Those measures included requiring officers and employees to sign agreements with confidentiality provisions; requiring third parties to enter into non-disclosure agreements; being selective as to how much information to share with third parties; maintaining data on protected computer equipment; and usually requiring execution of an additional release by Xavian's actuarial firm that included Xavian as a third-party beneficiary.

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in paragraph 27, and therefore denies them, except that Boeing specifically denies that Xavian's

complaint identifies any trade secrets and also denies that Xavian took appropriate protective

measures with respect to third parties.

**B. Xavian and BCC Enter Into a Proprietary Information Agreement.**

**28.     In September 2007, Xavian and BCC entered into a Proprietary Information Agreement that broadly defined "Proprietary Information" as including "all proprietary, confidential, and/or trade secret information disclosed by either Party to the other and pertaining to business, marketing, operational, and financial matters." Ex. 1 at ¶ 1.  BCC agreed that it would "preserve in confidence, not disclose to others, and not use (except for the purpose set forth in paragraph A of this Agreement) any and all Proprietary Information received" from Xavian. at *Id*. at ¶ 2.  The only permissible use of Xavian's Proprietary Information involved BCC and Xavian having discussions with each other about aviation finance, Boeing Customer Finance, ECA Finance and aviation matters in general.  *Id*. ¶ A.**

Boeing asserts that the Proprietary Information Agreement speaks for itself, and denies

any allegations inconsistent with the Proprietary Information Agreement.  To the extent further

response is required, Boeing denies the allegations of paragraph 28.

**29.     The Proprietary Information Agreement expired after two years, but continued to protect any Proprietary Information disclosed during its term: "Any such expiration or termination, however, will have no effect upon rights or obligations relative to Proprietary Information disclosed to a Party under this Agreement prior to the effective date of such expiration or termination."  *Id.* ¶ 4.**

Boeing asserts that the Proprietary Information Agreement speaks for itself, and denies

any allegations inconsistent with the Proprietary Information Agreement.  To the extent further

response is required, Boeing denies the allegations of paragraph 29.

**C. Under the Protection of the Proprietary Information Agreement, Xavian Shares Its [Alleged] Trade Secrets with BCC.**

**30.     Later in September 2007, after execution of the Proprietary Information Agreement, Xavian Co-Founders Stone and Kittredge had an initial meeting with BCC during which two things were made abundantly clear: (a) BCC had never collected the data necessary to analyze the possibility of a private alternative to Ex-Im, much less done any actuarial work; and (b) BCC had tried in the past without any success to persuade the U.S. rating agencies to change their model for evaluating the risk of loss for aircraft financing.  Indeed, BCC told Xavian that Xavian would never secure the necessary credit**

rating from one particular U.S. rating agency, claiming that the key person there did not understand aircraft financing.

Boeing admits that there was a meeting in the fall of 2007 between Xavian and certain individuals at BCC, but denies the remaining allegations in paragraph 30.

31. Over the next two years, Xavian and Boeing had additional formal and informal meetings and dozens of email exchanges and phone conversations. Under the protection of the Proprietary Information Agreement, Xavian shared all of its trade secrets with BCC, including a detailed business plan with attachments such as Xavian's actuarial work and Xavian's rating agency submission.

Boeing admits that, between the fall of 2007 and the fall of 2009, there were contacts between Xavian and at least one person at BCC, but denies the remaining allegations of paragraph 31.

32. In April 2009, after many months of detailed negotiations, Xavian accomplished what BCC had claimed could not be done – it persuaded a major rating agency to significantly change its rating model for aircraft financing, confirming the viability of a single-A rating and providing the detailed path on how Xavian could obtain a double-A or even triple-A credit rating. Importantly, Xavian also disclosed to BCC a "Plan B" business model for offering the Xavian insurance-based guarantee through a consortium of three to four large insurance companies. Indeed, in 2011, Xavian's Shettle shared detailed plans with Boeing about the proposed consortium, and Boeing stated that it would consider an investment in the project of $50 million. Through Xavian's trade secrets, BCC obtained the necessary roadmap to implement a private, insurance-based guarantee for aircraft financing.

Boeing denies BCC made the alleged "claim" in the first sentence of paragraph 32, and otherwise is without knowledge sufficient to form a belief as to the truth of the allegations in that sentence, and therefore denies them. Boeing denies the remaining allegations in paragraph 32.

33. Recipients of the Xavian trade secrets included Kostya Zolotusky, BCC's Managing Director of Capital Markets and Leasing; Scott Scherer ("Scherer"), BCC's Vice President and General Manager of Aircraft Financial Services; Tim Myers, BCC's Vice President and Senior Managing Director of Structured Finance (Mr. Myers now is BCC's President); and other BCC executives.

Boeing denies the allegations in paragraph 33.

**34.      Scherer served as the point person for BCC's relationship with Xavian.  For the next several years, Scherer showed great enthusiasm and responsiveness about Xavian. He proactively asked Stone about the status of developments.  He reached out to Stone about getting together when he visited New York.  He made himself available to speak with a large private equity firm that was considering an investment in Xavian, and he provided upcoming aircraft sales data relevant to Xavian's rating agency discussions.  The relationship with Scherer and BCC became so close that Xavian even included Scherer on Xavian's "friends and family" updates on company developments.  Xavian thought BCC was taking these steps in anticipation of making a commitment to finance Boeing aircraft through Xavian – a commitment that would have ensured Xavian's commercial success.**

In response to the first sentence of paragraph 34, Boeing admits that Xavian communicated with Scherer, but Boeing denies that Scherer was designated a "point person" for BCC or that Scherer had authority to bind BCC in any dealings with Xavian.  Boeing denies all remaining allegations and characterizations contained in the first sentence of paragraph 34. Boeing denies the allegations in the second sentence of paragraph 34.  In response to the third and fourth sentence of paragraph 34, Boeing admits that Scherer had occasional contact with Stone regarding Xavian's status and met with Stone on occasion when Scherer was otherwise in New York.  Boeing denies all remaining allegations and characterizations in the third and fourth sentences of paragraph 34.  Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the remaining sentences of paragraph 34, and therefore denies them, and specifically denies the characterization of the "relationship" between BCC and Xavian.

**D.  Xavian Retains a Marsh Subsidiary as Its Fiduciary Agent to Assist in Pursuit of the Xavian Business Model.**

**35.      In August 2009, Xavian retained a Marsh subsidiary, Guy Carpenter & Company ("Carpenter"), to act as Xavian's reinsurance intermediary.  The contractual arrangement with Carpenter included a provision designating the information provided by Xavian to Carpenter as confidential.  As Xavian's reinsurance intermediary, Carpenter would act as Xavian's agent in having discussions with insurance companies about their willingness to provide reinsurance for the Xavian insurance-based guarante.  The very nature of this agency relationship required Carpenter to understand Xavian's entire business model, including Xavian's trade secrets.  Carpenter owed fiduciary duties to Xavian within the scope of the parties' agency relationship, including a post-termination duty not to usurp Xavian's trade secrets.**

14

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in paragraph 35, and therefore denies them.

**36.     By early 2010, Carpenter's agency representation of Xavian had expanded to include the pursuit of a potential third-party investment in Xavian.  Carpenter arranged for a meeting between Xavian and high-level executives in the Marsh corporate family because March was considering selling the Xavian insurance-based guarantee to airlines. Xavian explicitly told Carpenter that the Xavian information provided to Marsh by Carpenter consisted of protected trade secrets.  Shettle also helped set up the Marsh meeting.  Marsh thus gained access to all of Xavian's trade secrets, but it did so subject not only to a confidentiality provision, but also subject to the stringent fiduciary duties that Carpenter owed to Xavian as Xavian's agent.  Significantly, BCC knew about the Xavian/Marsh relationship, because Stone had updated Scherer on Xavian's reinsurance plans, including the fact that Xavian had retained a Marsh subsidiary.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in the first five sentences of paragraph 36, and therefore denies them.  Boeing denies the

allegations in the sixth sentence of paragraph 36.

### E.  Boeing's Motive to [Allegedly] Steal Xavian's [Alleged] Trade Secrets.

**37.     From 2000 through 2015, Ex-Im provided almost $100 billion in loan guarantees in connection with the sale of Boeing commercial aircraft.  Boeing repeatedly warned the market that the lack of availability of Ex-Im financial support could have a material impact on Boeing's sales.  Analysts similarly understood that Ex-Im's financial support was critical to Boeing's ability to sell commercial aircraft to foreign airlines with credit ratings below investment grade.  While Congressional critics in the United States claimed that Ex-Im's financial support constituted corporate welfare and should be discontinued, Airbus faced no such political uncertainty about the continued support of Europe's equivalent to Ex-Im.  The chart below, which is derived from Ex-Im's annual reports, summarizes the financial support that Ex-Im provided for Boeing commercial aircraft sales in the form of both loans and guarantees:**



In response to the allegations in the first sentence of paragraph 37, Boeing admits that from 2000 through 2015, Ex-Im provided financing support to certain purchasers of commercial airplanes manufactured by Boeing, with Ex-Im data on the amount of such support speaking for itself. In response to the allegations in the second sentence of paragraph 37, Xavian has not identified the source or identity of any statements Boeing made to the market, and Boeing asserts that any statements it made in public filings or to the market speak for themselves. Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of paragraph 37, and therefore denies them. Boeing denies the allegations in the fifth sentence of paragraph 37, because among other reasons, Boeing does not know the source of the information, the guarantees issued by the Ex-Im Bank were not "financial support" to Boeing, and the heading on the chart is erroneous in that it describes the chart as showing "Loans & Guarantees To Boeing." Boeing denies the remaining allegations in paragraph 37.

**38.     By mid-2015, BCC was acutely aware that Congress planned to eliminate Ex-Im's financial support of Boeing's commercial aircraft sales, thereby threatening to drastically reduce Boeing's sales.  Before 2015, BCC clearly had interest in having Xavian's insurance-based guarantee available to complement Ex-Im's financial support.  The loss of Ex-Im's financial support, however, created a critical need for the Xavian insurance-based guarantee to be available as a complete replacement for billions in annual Ex-Im financial support.  Indeed, by February 2016, Boeing's stock price had dropped precipitously to approximately $108, down from a stock price frequently above $150 throughout 2015.**

In response to the first sentence of paragraph 38, Boeing admits that it was aware the Bank's charter was set to expire in June 2015.  Boeing denies the remaining allegations in the first sentence of paragraph 38.  Boeing denies the allegations in the second and third sentences of paragraph 38.  In response to the allegations in the fourth sentence of paragraph 38, Boeing asserts that its stock price speaks for itself, and otherwise denies the remaining allegations in the fourth sentence of paragraph 38.

**39.     BCC's Scherer summarized Boeing's state of mind in a June 12, 2015 email to Stone:**

> **Hi Thatcher,**
> **I hope you are well.**
> **As you know, it looks like Ex-Im's reauthorization will lapse on June 30.**
> **It [sic] Xavian resurrectable?**
> **Best,**
> **Scott**

**Ex. 2.**

Boeing asserts that the email attached as Exhibit 2 to the Complaint speaks for itself, and denies any allegations inconsistent with the email.  Boeing specifically denies that the email "summarized Boeing's state of mind."

**40.     During their follow-up telephone conversation, Stone reminded Scherer that Xavian's "Plan B" business plan consisted of offering the Xavian insurance-based guarantee through a consortium of three to four large insurance companies and this could easily be accomplished.  Scherer never followed up after that conversation.  Instead, Boeing and BCC secretly decided to resurrect Xavian on their own and as their own.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the first two sentences of paragraph 40, and therefore denies them. Boeing denies the allegations in the third sentence of paragraph 40.

**F. Boeing Proactively Uses Xavian's Proprietary Information to Form the AFIC Insurance Consortium.**

**41. In June 2017, Boeing and Marsh announced the formation of AFIC, a consortium of four large insurance companies offering an insurance-based guarantee that was in fact, developed by and proprietary to Xavian.**

Boeing denies the allegations in paragraph 41.

**42. Marsh announced that it had hired Morin, who became the public face of AFIC. At an industry conference in January 2018, Morin stated that AFIC had already provided $1.5 billion in financing for 16 aircraft for four airline clients and one leasing company. Boeing and Marsh predict further strong growth of AFIC, with Boeing projecting that AFIC will guarantee up to 5% of its commercial aircraft sales in 2018.**

In response to the allegations in Paragraph 42, because Xavian does not identify a source for the statements, projections, and figures it alleges, and because there are multiple ways to calculate these metrics, Boeing is without knowledge sufficient to form a belief as to the truth of those allegations, and therefore denies them.

**43. Press coverage and Boeing's own public statements suggest that Boeing approached Marsh about creating AFIC. Without Xavian and the roadmap provided by its trade secrets, Boeing and BCC would have been unable to do the necessary work to organize and launch AFIC in June 2017. Based on Xavian's dealings with BCC, Xavian concluded that BCC had not collected the necessary data or performed any actuarial work. Further, its past failure to persuade the rating agencies to adjust their aircraft financing risk models showed that BCC did not have the knowledge necessary to direct the actuarial work. Indeed, BCC is not even in the insurance business. In addition, it is certainly not a coincidence that Boeing teamed up with Marsh (an insurance broker that BCC knew had complete access to Xavian's trade secrets through its fiduciary relationship with Xavian); or that Marsh hired Morin (who had access to all of Xavian's trade secrets, but no permission to use or share those trade secrets).**

Boeing denies the allegations in the first sentence of paragraph 43, among other reasons because it misstates Boeing's role in the formation of AFIC. Boeing denies the allegations in the

second sentence of paragraph 43. Boeing is without knowledge sufficient to form a belief as to

the truth of the allegations (i.e., what "Xavian concluded") in the third sentence of paragraph 43,

and therefore denies them. Boeing denies the allegations in the fourth sentence of paragraph 43.

In response to the fifth sentence of paragraph 43, Boeing admits that BCC does not originate

insurance policies and otherwise denies the allegations and characterizations in that sentence.

Boeing denies the allegations and characterizations in the sixth sentence of paragraph 43.

**44. According to Morin, Boeing and Marsh worked together for two years in
preparation for the launch of AFIC, approaching approximately 40 different insurance
companies about their interest in joining AFIC. Morin also confirmed the critical
importance of having the necessary data to enable the insurance companies to evaluate the
risk of loss and determine whether to participate in the consortium. Of necessity, the
insurance companies would have relied on the data necessary to make presentations to the
U.S. rating agencies about how the issuance of guarantees for expensive commercial
aircraft potentially would impact their future overall ratings. Without the roadmap
provided by Xavian's trade secrets, Boeing and Marsh would not have had sufficient time
to do all the work necessary to launch AFIC after just two years (most of which appears to
have been spent negotiating with approximately 40 insurance companies – the final step
necessary to putting together the consortium of large insurance companies under Xavian's
Plan B).**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations

in the first two sentences of paragraph 44, and therefore denies them. Boeing denies the

allegations in the remaining sentences of paragraph 44.

**45. The AFIC concept has received a number of industry awards that confirm
the proprietary, trade secret nature of Xavian's ideas and analysis:**

- **The AFIC concept was nominated as a finalist for the 2017 European Risk
Management Awards under the category of "Broker Innovation of the
Year."**

- **A company of insurance industry figures called Ishka awarded AFIC as the
"Most Innovative Deal 2017" for its use of Xavian's insurance-based
guarantees in connection with a jet refinancing for Korea Air. Ishka stated
that "We had to recognize this deal as it was exceptional."**

- **In January 2018, AFIC received Airline Economics' "Editor's Deal of the Year for Innovation" award.**

- **Also in January 2018, Global Transport Finance awarded AFIC its "Aircraft Finance Unique Leasing Deal of the Year" and "Aircraft Finance Deal of the Year – Asia" awards.**

- **Airline Economics recognized AFIC for three awards, including the "Deal of the Year for Innovation" for the first insurance-based guarantees, and the "Aviation Finance Person of the Year" for Morin.**

- **At the 2018 Reaction London Markets Awards, Marsh received the award for "Global Achievement of a London Market Broker" for the AFIC concept.**

Boeing asserts that the referenced sources speak for themselves. Boeing denies that Xavian's complaint identifies any "proprietary, trade secret" ideas or analysis and denies all remaining allegations and characterizations in paragraph 45.

46. **Industry awards confirm that the concept AFIC stole from Xavian was not generally known in the industry and qualified as a cutting-edge innovation in 2017 and 2018. Boeing not only intentionally misappropriated Xavian's trade secrets to form AFIC, but it has heavily promoted the AFIC concept at industry conferences and to airlines, thereby helping AFIC bask in the industry glory of receiving such prestigious awards touting the innovative and brilliant nature of what are, in fact, Xavian's trade secrets.**

Boeing denies the allegations in paragraph 46.

47. **AFIC has admitted – in fact, proclaimed – that the insurance-based guarantee it (wrongly) claims as its own is novel and innovative. For example, during a 2018 presentation in Dublin, Ireland, Morin explained that:**

> **There are probably half a dozen points in developing this product where we said, "ah ha, that's why this hasn't been done before. But somehow, we figured out a way around those issues or get over those issues, or sometimes through those issues."**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in paragraph 47, and therefore denies them.

48. **Morin also stated that insurers that AFIC approached about the insurance-based guarantee responded to the actuarial data by saying "they couldn't believe it" and "you must be cooking the data, Bob." Yet the AFIC program effectively is Xavian's Plan B.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 48, and therefore denies them. Boeing denies the allegations in the second sentence of paragraph 48.

**49.      Even though Boeing and Marsh launched AFIC in early June 2017, no competitor has emerged to challenge AFIC. In responding to a question at the Dublin conference about whether a competitor might emerge to offer a similar insurance-based guarantee to Airbus, Morin responded that it was possible, but explained that "this was under development for two years. I mean you people are not seeing sort of like an iceberg. You can see the tip. You don't get to see everything that went on underneath it." Soon thereafter, Marsh announced Project Balthazar, a Marsh-formed consortium offering an insurance-based guarantee for the sale of Airbus aircraft. By misappropriating Xavian's trade secrets, Boeing and Marsh have gained a substantial and sustainable first-mover advantage, with Boeing's ability to refer business to AFIC creating additional barriers to the entry of any potential competitor.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the first six sentences of paragraph 49, and therefore denies them. Boeing denies the allegations in the seventh sentence of paragraph 49.

**G.   Xavian's Discovery of Boeing's and BCC's [Alleged] Misconduct.**

**50.      In June 2016, Xavian learned that an aviation lawyer had requested a conflict waiver to represent Boeing on an insurance-based guarantee matter that would compete with Ex-Im. That was the first hint Xavian received that Boeing and BCC might have misappropriated Xavian's trade secrets. After hearing the news, Stone called Scherer, who had recently retired from BCC. In sharp contrast to their previous dealings, Scherer refused to say anything and told Stone only that he needed to call Kostya (a reference to BCC's Kostya Zolotusky). Stone left voicemails for Mr. Zolotusky, who had received Xavian's trade secrets under the Proprietary Information Agreement and had discussed them with Stone and Kittredge. But despite previous interest and cooperation from BCC, Stone received no response from Mr. Zolotusky. In addition, at the time, Stone had a friendly relationship with Boeing's general counsel, whom Stone had contacted based on their University of Virginia School of Law connection and frequent conversations about the Ex-Im situation in Congress. Yet Boeing's general counsel failed to return three separate phone calls from Stone, thereby confirming that knowledge of the misappropriation of Xavian's trade secrets had reached the highest levels of Boeing.**

Boeing is without knowledge sufficient to form a belief as to the truth of the allegations in the first four sentences of paragraph 49, and therefore denies them, except that Boeing

specifically denies it "misappropriated Xavian's trade secrets."  Boeing denies the allegations in

the remaining sentences of paragraph 50.

## COUNT I

### (Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

**51.     As a factual basis for its allegations, Xavian incorporates the prior paragraphs of its complaint as if set forth fully here.**

Boeing incorporates by reference its responses to the allegations in paragraphs 1-50 of

the Complaint as if fully restated in this paragraph.

**52.     As described above, the proprietary and confidential information Xavian shared with BCC and Boeing constitute Xavian's "trade secrets" as that term is defined in 18 U.S.C. § 1839(3).  Xavian took reasonable measures to keep its proprietary and confidential information secret; and that information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or sue of the information.**

Paragraph 52 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 52.

**53.     BCC and Boeing misappropriated Xavian's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets without the express or implied consent of Xavian.  Specifically, BCC acquired, disclosed and used Xavian's trade secrets in breach of BCC's contractual duty to Xavian to maintain secrecy in violation of 18. U.S.C. § 1839(5)(A)-(B).  For its part, Boeing acquired, disclosed and used Xavian's trade secrets while knowing, or having reason to know, that Boeing learned Xavian's trade secrets though BCC's breach of its contractual duty to Xavian to maintain secrecy in violation of 18 U.S.C. § 1839(5)(B)(ii).  Further, under the inevitable disclosure doctrine, a presumption exists that Marsh and Morin disclosed Xavian's trade secrets to Boeing and BCC.  *See Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 195431 at \*5 (N.D. Ill. May 11, 2017) (applying inevitable disclosure doctrine to DTSA claim).**

Paragraph 53 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 53.

54.     Moreover, Boeing continues to use the misappropriated trade secrets by selling commercial aircraft in financing transactions relying on the AFIC guarantee and by actively promoting the use of the AFIC guarantee.

Paragraph 54 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 54.

55.     BCC' and Boeing's misappropriation of Xavian's trade secrets has caused Xavian substantial damages.  As remedies for the misappropriation, Xavian seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by 18 U.S.C. § 1836(b)(3)(B)(i).  As an alternative to lost profits, Xavian seeks an award of damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for BCC's and Boeing's unauthorized disclosure and use of the trade secret, as authorized by 18 U.S.C. § 1836(b)(3)(B)(ii).

Paragraph 55 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 55.

56.     Because BCC and Boeing willfully and maliciously misappropriated Xavian's trade secrets, Xavian seeks an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(D).

Paragraph 56 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 56.

WHEREFORE, Plaintiff, Xavian Insurance Company and Xavian Holdings, Inc., respectfully request that the Court enter judgment in favor and against Defendants, Boeing Capital Corporation and The Boeing Company, as follows:

a.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. actual damages for misappropriation in an amount to be determined at trial;

b.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. unjust enrichment damages for misappropriation in an amount to be determined at trial;

      **c.     As an alternative to (a) and (b), awarding Xavian Insurance Company and Xavian Holdings, Inc. a reasonable royalty for misappropriation in an amount to be determined at trial;**

      **d.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. their reasonable attorney's fees;**

      **e.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. exemplary damages;**

      **f.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. prejudgment and post-judgment interest as permitted by law;**

      **g.     Awarding Xavian Insurance Company and Xavian Holdings, Inc. their costs; and**

      **h.     Granting such other and further relief that this Court finds just and appropriate.**

Boeing denies that Xavian is entitled to any of the relief sought in its prayer for relief for Count I.

## COUNT II

### (Misappropriation of Trade Secrets in Violation of the Washington Uniform Trade Secrets Act, Wash. Rev. Code Chapter 19.108)

**57.     As the factual basis for its allegations, Xavian incorporates the prior paragraphs of its complaint as if set forth fully here.**

Boeing incorporates by reference its responses to the allegations in paragraphs 1-57 of the Complaint as if fully restated in this paragraph.

**58.     As described above, the proprietary and confidential information Xavian shared with BCC and Boeing constitute Xavian's "trade secrets" as that term is defined in Revised Code of Washington § 19.108.010(4). Xavian took reasonable measures under the circumstances to keep its proprietary and confidential information secret; and that information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.**

Paragraph 58 sets forth conclusions of law to which no response is required. To the extent further response is required, Boeing denies the allegations in paragraph 58.

59.     BCC and Boeing misappropriated Xavian's trade secrets by acquiring those trade secrets through improper means and by disclosing and using those trade secrets without the express or implied consent of Xavian in violation of Revised Code of Washington § 19.108.010(1)-(2).  Specifically, BCC acquired, disclosed and used Xavian's trade secrets in breach of BCC's contractual duty to Xavian to maintain secrecy in violation of Revised Code of Washington § 19.108.010(1) and § 19.108.010(2)(b)(i).  For its part, Boeing acquired, disclosed and used Xavian's trade secrets while knowing, or having reason to know, that Boeing learned Xavian's trade secrets through BCC's breach of its contractual duty to Xavian to maintain secrecy in violation of Revised Code of Washington § 19.108-010(2)(b)(ii)(A)-(C).  Further, under the inevitable disclosure doctrine, a presumption exists that Marsh and Morin disclosed Xavian's trade secrets to Boeing and BCC.

Paragraph 59 sets forth conclusions of law to which no response is required.  To the extent further response is required, Boeing denies the allegations in paragraph 59.

60.     Moreover, Boeing continues to use the misappropriated trade secrets by selling commercial aircraft in financing transactions relying on the AFIC guarantee and by actively promoting the use of the AFIC guarantee.

Paragraph 60 sets forth conclusions of law to which no response is required.  To the extent further response is required, Boeing denies the allegations in paragraph 60.

61.     BCC's and Boeing's misappropriation of Xavian's trade secrets has caused Xavian substantial damages.  As remedies for the misappropriation, Xavian seeks an award of damages for its actual loss caused by the misappropriation, as well as damages for unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, as provided by Revised Code of Washington § 19.108.030(1).  As an alternative to lost profits, Xavian seeks an award of damages caused by the misappropriation as measured by a reasonable royalty.

Paragraph 61 sets forth conclusions of law to which no response is required.  To the extent further response is required, Boeing denies the allegations in paragraph 61.

62.     Because BCC and Boeing willfully and maliciously misappropriated Xavian;s trade secrets, Xavian seeks an award of exemplary damages pursuant to Revised Code of Washington § 19.108.030(2) and an award of reasonable attorney's fees pursuant to Revised Code of Washington § 19.108.040.

Paragraph 62 sets forth conclusions of law to which no response is required.  To the

extent further response is required, Boeing denies the allegations in paragraph 62.

**WHEREFORE, Plaintiff, Xavian Insurance Company and Xavian Holdings, Inc.,
respectfully request that the Court enter judgment in their favor and against Defendants,
Boeing Capital Corporation and The Boeing Company, as follows:**

**a.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. actual
damages for misappropriation in an amount to be determined at trial;**

**b.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. unjust
enrichment damages for misappropriation in an amount to be determined at trial;**

**c.      As an alternative to (a) and (b), awarding Xavian Insurance Company and
Xavian Holdings, Inc. a reasonable royalty for misappropriation in an amount to be
determined at trial;**

**d.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. their
reasonable attorney's fees;**

**e.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. exemplary
damages;**

**f.      Awarding Xavian Insurance Company and Xavian Holdings, Inc.
prejudgment and post-judgment interest as permitted by law;**

**g.      Awarding Xavian Insurance Company and Xavian Holdings, Inc. their costs;
and**

**h.      Granting such other and further relief that this Court finds just and
appropriate.**

Boeing denies that Xavian is entitled to any of the relief sought in its prayer for relief for

Count II.

## V.      DISCOVERY RULE

**63.      Xavian pleads that the discovery rule applicable to misappropriation claims
brought under federal law, 18 U.S.C. § 1836(d), and Washington law, Revised Code of
Washington § 19.108.060, applies in this case and that this lawsuit has been brought within
three years after the misappropriation was discovered or by the exercise of reasonable
diligence should have been discovered.**

Paragraph 63 sets forth conclusions of law to which no response is required. To the extent further response is required, Boeing denies the allegations in paragraph 63, and Boeing reserves all rights to move to dismiss this case for failure to file it within the applicable statutes of limitations.

## VI.    JURY DEMAND

**64.    Xavian demands a trial by jury.**

Paragraph 64 contains a demand for trial by jury to which no response is required.

## <u>AFFIRMATIVE DEFENSES</u>

Subject to its responses above, and upon information and belief, Boeing alleges and asserts the following defenses in response to the allegations in the Complaint. Regardless of how such defenses are listed herein, Boeing undertakes the burden of proof only as to those defenses that are deemed affirmative defenses as a matter of law. In addition to the affirmative defenses described below, Boeing reserves the right to amend or raise additional affirmative defenses pursuant to any docket control order or as additional information becomes available through further investigation and discovery.

### FIRST DEFENSE
### (Failure to State a Claim)

The Complaint filed by Xavian fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
### (Statute of Limitations)

Xavian failed to file its Complaint within the applicable statutes of limitation.

### THIRD DEFENSE
### (No Trade Secrets)

The supposed trade secrets alleged in Xavian's Complaint were not unique, were readily

ascertainable, and were not confidential or proprietary and did not constitute protectable trade secrets.

### FOURTH DEFENSE
### (No Economic Value)

The supposed trade secrets alleged in Xavian's Complaint derive no economic value from not being generally known to others and therefore are not protectable trade secrets.

### FIFTH DEFENSE
### (No Maintenance of Secrecy)

Xavian failed to insure that the information claimed to be a trade secret was the subject of efforts that were reasonable to maintain its secrecy.

### SIXTH DEFENSE
### (Failure To Identify Trade Secrets)

Xavian has failed to describe or identify with reasonable particularity the alleged trade secrets that Boeing has allegedly misappropriated.

### SEVENTH DEFENSE
### (No Causation)

Xavian's claims against Boeing are barred because Xavian's damages, if any, were not caused by Boeing.

### EIGHTH DEFENSE
### (No Damages)

Xavian's claims are barred because Xavian has not suffered any damages as a result of Defendants' conduct.

### NINTH DEFENSE
### (Equitable Defenses)

Xavian's claims are barred, in whole or in part, by the doctrines of waiver, implied

waiver, implied license, exhaustion, acquiescence, equitable estoppel, unclean hands and/or other equitable remedies.

## TENTH DEFENSE
### (Standing)

Xavian has failed to plead that it owns the information which it asserts is a trade secret, and thus lacks standing to pursue its claims.

## ELEVENTH DEFENSE
### (Reservation of Rights)

Defendants do not yet have knowledge of all facts and evidence surrounding this matter and, as a result, reserve their rights to amend their Answer and raise additional affirmative defenses as they are discovered.

## JURY DEMAND

Boeing demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Boeing prays that the Court enter judgment in its favor and against Xavian as follows:

A.  Dismissing, with prejudice, Xavian's claims against Boeing and denying each and every prayer for relief contained in the Complaint;

B.  Ruling in favor of all of Boeing's affirmative defenses;

C.  Awarding Boeing its expenses and costs in accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

D.  Awarding Boeing its reasonable attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D);

    E.      Awarding Boeing its reasonable attorney's fees pursuant to Revised Code of

           Washington § 19.108.040; and,

    F.      Awarding Boeing any other relief the Court may deem just and proper.


Dated: November 9, 2018            Respectfully submitted,


                                        BOEING CAPITAL CORPORATION and THE
                                        BOEING COMPANY


                                      By:     *s/ George R. Spatz*
                                              One of Its Attorneys

                                      Christina M. Egan
                                      George R. Spatz
                                      McGUIREWOODS LLP
                                      77 W. Wacker Drive, Suite 4100
                                      Chicago, Illinois  60601-1818
                                      (312) 849-8100
                                      (312) 849-3690 (fax)
                                      cegan@mcguirewoods.com
                                      gspatz@mcguirewoods.com

                                      Brian C. Riopelle
                                      Rodney A. Satterwhite
                                      McGUIREWOODS LLP
                                      Gateway Plaza
                                      800 East Canal Street
                                      Richmond, VA 23219-3916
                                      (804) 775-1000
                                      (804) 775-1061 (fax)
                                      briopelle@mcguirewoods.com
                                      rsatterwhite@mcguirewoods.com

                                      Benjamin L. Hatch
                                      McGUIREWOODS LLP
                                      World Trade Center
                                      101 West Main Street
                                      Suite 9000
                                      Norfolk, VA 23510-1655
                                      (757) 640-3700
                                      (757) 640-3701 (fax)
                                      bhatch@mcguirewoods.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing **DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT** was electronically filed with the Clerk of the Court using the CM/ECF system on November 9, 2018, which will send notification of such filing to all counsel of record.

<u>s/ *George R. Spatz*</u>