UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| XAVIAN INSURANCE COMPANY and <br> XAVIAN HOLDINGS, INC. | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | No. 18 C 6222 |
| v. | ) <br> ) | |
| BOEING CAPITAL CORPORATION and <br> THE BOEING COMPANY | ) <br> ) <br> ) | Judge Thomas M. Durkin |
| Defendants. | ) <br> ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Xavian Insurance Company and Xavian Holdings, Inc. (together, "Xavian") seek to disgorge billions of dollars in profits and recover millions of dollars in royalty payments from defendants Boeing Capital Corporation and the Boeing Company (respectively, "BCC" and "Boeing," and together "Defendants") for their alleged misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"), and Washington Uniform Trade Secrets Act, Wash. Rev. Code § 19.108 ("WUTSA"). Defendants moved to dismiss for failure to state a claim. R. 50. For the following reasons, Defendants' motion is denied.

## Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of

the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

Xavian was formed in 2007 to explore a potential business model for the private insurance of aircraft purchases by foreign airlines with poor credit ratings. At that time, the Export-Import Bank of the United States (the "Ex-Im Bank") had been providing government-backed all-risk export credit guarantees to encourage lenders to finance such purchases; there were no private insurance options. But transactions with the Ex-Im Bank were subject to certain restrictions imposed pursuant to an international agreement, and the Ex-Im Bank's future was uncertain, including because of political opposition. Xavian's founders believed it possible to provide a

2

more flexible approach to financing by offering longer loan terms and lower principal payments. But they needed capital and an investment-grade credit rating in order to be viable. Accordingly, Xavian's founders sought to raise $300 million, and developed: (1) an actuarial analysis defining the loss for given default rates for foreign airlines with below investment grade credit ("actuarial analysis"); and (2) a ratings analysis that credit agencies would use in the event Xavian was successful in entering the private insurance business ("ratings analysis").

Xavian retained an actuarial firm to analyze its risk profile in an effort to obtain an investment-grade credit rating, and ultimately persuaded a major credit rating agency to change its rating model for aircraft financing. According to Xavian, this confirmed the viability of a single-A credit rating for its business, provided Xavian could raise enough capital.

To that end, in September 2007, Xavian approached BCC—which provides financing for Boeing customers—as a potential investment partner. Xavian knew that the Ex-Im Bank had provided billions of dollars in financial support for Boeing's sales to foreign airlines with non-investment grade credit ratings, and that Defendants might be interested in an alternative. Xavian and BCC entered into a proprietary information agreement governed by the laws of the state of Washington (the "PIA"). Under the PIA, both parties agreed to "preserve in confidence, not disclose to others, and not use [except for purposes not applicable here] any and all Proprietary Information received from the other" (the "PIA"). R. 44 ¶ 36; *id.*, Ex. 1 at 1. The PIA defined "Proprietary Information" as:

all proprietary, confidential, and/or trade secret information disclosed
by either Party to the other and pertaining to business, marketing,
operational, and financial matters.

*Id.*, Ex. 1 at 1. The PIA further provided that Proprietary Information:

when first received . . . must be either (i) in written form and marked
with an appropriate restrictive legend or (ii) not in written form but
initially identified to the receiving Party as proprietary and/or
confidential and thereafter promptly confirmed, in writing to the
receiving Party, as being Proprietary Information.

*Id.* At a meeting in 2008,[1] Xavian gave BCC multiple hard copies of its business plan, which included several attachments. Among the attachments were Xavian's actuarial and ratings analyses. R. 44 ¶¶ 39-40. The first page of Xavian's business plan was prominently marked at the top and bottom: "Confidential – for Company Disclosure Only"—a designation that was repeated on each page of the plan. *Id.* ¶ 40. Additionally, a section titled "Confidential Undertaking – Must Read" stated:

This document contains business secrets, trade secrets, confidential
information and proprietary data owned, licensed to or created by
Xavian Holdings Inc. ("Xavian"). It is supplied exclusively to the reader
with the express understanding that (A) it shall be kept completely
confidential, and (B) no portion of the contents of this five year plan (the
"Plan") shall be disclosed to any person, firm or entity that is not an
employee of the reader, except professionals who have a need to know
the material contained herein, receive it in a professional capacity, agree
in writing to keep it confidential, and return it to the reader when such
professional's work is completed.

*Id.* Per its terms, the PIA automatically expired in September 2009, but Proprietary Information shared before then remained protected indefinitely. *Id.* at 2.

---

[1] The amended complaint states that the meeting occurred in 2018, but the Court assumes this was an error based on the other allegations in the amended complaint.

Xavian also developed a "Plan B" as an alternative to its original plan ("Plan A"). Under Plan B, aircraft sales would be guaranteed through a consortium of three or four large insurance companies. Unlike Plan A, Plan B did not call for establishing a new, free-standing entity and did not require a new credit rating. Instead, existing insurers (with existing credit ratings and capital) would collectively guarantee financing for a sale in order to pool the risk of default.

Xavian disclosed to BCC that it "had developed its Plan B" in February 2009, and the parties engaged in discussions "related to the written materials that Xavian had already designated in writing as confidential." Xavian also "made plans to discuss [Plan B] with BCC in more detail." *Id.* ¶ 46.

Xavian did not share specifics about Plan B with BCC until 2011. According to the amended complaint, the 2011 discussions also "related to Xavian's written business plan and attachments that were properly designated as confidential" under the PIA. *Id.* At that time, Boeing told Xavian that it would consider a $50 million investment. *Id.* But ultimately Boeing did not invest in Xavian, and Xavian was only able to raise a small fraction of its capital goal. As a result, Xavian did not receive a credit rating or guarantee the financing of any airline sales, and was unable to launch.

But in June 2015 discussions between Xavian and BCC resumed because BCC learned that Congress planned to eliminate the Ex-Im Bank's financial support of Boeing's commercial aircraft sales. Defendants understood that this could drastically reduce Boeing's sales numbers, creating a need for Xavian's private insurance-based

5

guarantee as a replacement. *Id.* ¶ 48. Accordingly, BCC's Vice President and General Manager of Aircraft Financial Services emailed one of Xavian's founders asking if Xavian was "resurrectable." *Id.* ¶ 49. The two discussed the possibility by telephone, including the possibility of a consortium. But BCC never contacted Xavian again. *Id.* ¶ 50.

Instead, Boeing teamed up with insurance broker Marsh & McLennan Companies, Inc. ("Marsh") to form its own insurance consortium. According to Xavian, Marsh had separately gained access to Xavian's trade secrets via a Marsh subsidiary that had served as Xavian's reinsurance intermediary in the pursuit of its business model. *Id.* ¶¶ 8, 43. Boeing and Marsh in turn made Xavian shareholder and former Ex-Im Bank employee Bob Morin the consortium's public face. Several years earlier, Morin had agreed in principle to become Xavian's Senior Vice President of Marketing, a commitment that allowed him access to "almost all" of Xavian's trade secrets. *Id.* ¶¶ 8, 28.

In June 2017, Boeing and Marsh publicly announced the formation of its Aircraft Finance Insurance Consortium (the "AFIC"), a consortium of four large insurance companies offering an insurance-based guarantee. *Id.* ¶¶ 8, 51. In 2017 and 2018, the AFIC made huge profits and received several insurance and aviation industry awards for its innovative concept. *Id.* ¶¶ 10, 64. Boeing has benefited directly from the AFIC, which guaranteed approximately 5% of its commercial aircraft sales in 2018. *Id.* ¶ 12. To date, no private insurance competitor to the AFIC has emerged. *Id.* ¶ 10.

6

Xavian filed its original complaint in this case in September 2018, seeking relief for the misappropriation of trade secrets under the DTSA and WUTSA. R. 1. Xavian filed a similar action against Marsh (among others) in the Southern District of New York that same day. *Xavian Ins. Co. v. Marsh & McLennan Cos., Inc.*, No. 1:18 CV 8273-DLC (S.D.N.Y.) (the "New York case"). Defendants moved to dismiss Xavian's complaint. R. 33. The Court subsequently allowed Xavian to file an amended complaint, and denied Defendants' motion as moot as a result. R. 43. Like the original complaint, the amended complaint purports to allege claims against Defendants under the DTSA and WUTSA. R. 44. Defendants again moved to dismiss, arguing that the amended complaint connects only Xavian's Plan B to Defendants' alleged misappropriation—a plan that is wholly distinct from Plan A and not subject to the protections of the PIA.

**Analysis**

The relevant portions of the DTSA and WUTSA are almost identical, and the definitions functionally equivalent; a claim for misappropriation under either the DTSA or WUTSA must allege facts that show both the existence of a trade secret and misappropriation of that trade secret. *See generally* 18 U.S.C. § 1836 *et seq.*; Wash. Rev. Code. § 19.108.10 *et seq.* The two laws define "misappropriation" to include in relevant part the "disclosure or use of a trade secret . . . without express or implied consent" by a person who acquired knowledge of the trade secret "under circumstances giving rise to a duty" to maintain its secrecy or limit its use. 18 U.S.C. 1839(5); Wash. Rev. Code § 19.108.010(2). To garner protection as a "trade secret,"

7

the laws require: (1) that the owner take reasonable measures to protect the information's secrecy; and (2) that the information derive independent economic value from not being generally known or ascertainable by another who can obtain economic value from its disclosure. 18 U.S.C. § 1839(3); Wash. Rev. Code § 19.108.010(4).

Here, Defendants argue that Xavian has failed to sufficiently allege that they used its information as required to demonstrate misappropriation, and that the alleged trade secrets were neither the subject of any reasonable efforts to maintain their secrecy, nor retained any value at the time Xavian alleges they were used. The Court addresses each argument in turn.

I.   **Defendants' Use of Xavian's Information**

Defendants' principle argument is that the amended complaint fails to plausibly allege that Defendants "used any protected Xavian information in the creation of the [the AFIC]." R. 75 at 2; *U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 633 (N.D. Ill. 2007) (there must be a "sufficient basis for inferring that [Defendants] actually used . . . the information"). In so arguing, Defendants attempt to draw a sharp line between Plan A and Plan B, asserting: (1) that only Plan A is subject to the protections of the PIA; (2) that Plan B—like the AFIC—is "an entirely different product;" and (3) that because the amended complaint fails to connect Plan A and Plan B, there can be no misappropriation. R. 51 at 12-13. The Court understands Defendants' attraction to this argument. Indeed, the amended complaint itself alleges that "the AFIC program effectively is Xavian's Plan B," and

lists several trade secrets Xavian purportedly developed, among them: "identifying the back-up, or 'Plan B' option of implementing the Xavian business model through a consortium." R. 44 ¶¶ 27, 66. But in opposing Defendants' motion, Xavian explained that the true focus of its trade secret allegations concern the actuarial and ratings analyses underlying its business plans, which the amended complaint alleged Defendants necessarily relied upon and were "key to forming [the AFIC]."[2] R. 62 at 8. The Court agrees. Although not a model of clarity, the amended complaint alleges (among other things):

- That during its existence, the Ex-Im Bank provided guarantees for nearly $100 billion in loans to foreign airlines with below investment grade credit for the purchase of Boeing commercial aircraft, and that those guarantees were backed by the United States Treasury and a "AAA" credit rating. R. 44 ¶¶ 2-3, 19-20.

- That no private alternative to Ex-Im existed during that time period, so Xavian set out to establish one. *Id.* ¶¶ 2, 4, 25.

- That in order to do so, Xavian had to develop actuarial and ratings analyses that had never before been prepared. *Id.* ¶¶ 2, 4.

- That BCC gained access to Xavian's actuarial and ratings analyses in 2008 under the protections of the PIA, and had no access to similar information before that. *Id.* ¶¶ 38-39.

- That BCC also learned of Xavian's Plan A and at least some aspects of its Plan B during the PIA's term. *Id.* ¶¶ 36-40, 45-46.

- That Defendants were motivated to find an alternative to the Ex-Im Bank quickly following its 2015 demise so that Boeing could continue the income stream it received by selling aircraft to foreign airlines with poor credit ratings. *Id.* ¶¶ 47-50.

- That BCC contacted Xavian in June 2015 before initiating the AFIC asking whether Xavian could be "resurrected," and discussed Xavian's "Plan B" again at that time. *Id.* ¶ 49.

---

[2] Xavian also acknowledged that "the mere idea of forming a consortium" is not a trade secret. R. 62 at 8.

9

- That BCC partnered with Marsh and Morin to form the AFIC, knowing that both had access to Xavian's confidential information and despite that BCC was not even in the insurance business. *Id.* ¶¶ 28, 44, 51, 53.
- That in the course of forming the AFIC, "Boeing and Marsh had to take Xavian's data and analysis to the insurance market" for the "obvious reason" that the market needed to be "educated" in order to consider participating in the novel insurance product proposed. *Id.* ¶ 54.
- And that as a result of its own experience talking to insurance companies and financial institutions about its private insurance business models, Xavian knew that the short timeline in which Defendants were able to have the same discussions was not long enough to allow it to also develop the AFIC without relying on Xavian's actuarial and ratings analyses. *Id.* ¶¶ 60-61.

This is enough to plausibly allege the necessity of, and Defendants' reliance upon, Xavian's analyses.

Defendants nevertheless argue that Xavian's allegations impermissibly "depend[ ] upon a series of inferences upon inferences." R. 65 at 3. But "[c]ourts have recognized that circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *PolyOne Corp. v. Lu*, 2018 WL 4679577, at *11-12 (N.D. Ill. Sept. 28, 2018). In fact, "[b]ecause direct evidence of theft and use of trade secrets is often not available," courts routinely allow a plaintiff to "rely on circumstantial evidence to *prove* misappropriation by drawing inferences from perhaps ambiguous circumstantial evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (emphasis added). As explained, Xavian has plausibly alleged that but for Defendants' access to and impermissible use of Xavian's actuarial and ratings analyses, the AFIC consortium was not possible. Thus, Defendants' inferences argument necessarily fails at this early stage. *See Fire 'Em Up, Inc. v. Technocarb Equip. Ltd.*, 799 F. Supp. 2d 846, 850 (N.D. Ill. 2011) ("[c]ourts only dismiss a

[misappropriation of trade secrets] claim for lack of specificity on the pleadings in the most extreme cases").

Defendants also contend that the amended complaint should be dismissed because Xavian's allegations are "far more consistent" with the "obvious alternative explanation" that Boeing developed a private sector alternative to the Ex-Im Bank without Xavian's analyses. R. 65 at 7 (quoting *Twombley*, 550 U.S. at 567). But having found Xavian's explanation plausible, the Court need not choose between it and Defendants' explanation. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[I]t is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."); *see also Brown v. Cook Cty.*, 2018 WL 3122174, at *4 (N.D. Ill. June 26, 2018) (defendant's "alternative explanation" was not "so obvious that it renders the plaintiffs' version less than plausible; accordingly, the Court rejects it as a basis for dismissal"). Defendants' "use" argument fails.

## II. Whether Xavian's Information Constitutes Trade Secrets

Defendants also argue both that Xavian failed to take reasonable measures to protect its alleged trade secrets, and that they are stale.[3] The Court addresses each argument below.

---

[3] Notably, Defendants stated in their most recent filing that they do not challenge the trade secret status of Xavian's actuarial and ratings analyses. R. 75 at 1 (arguing that the decision denying the defendants' motion to dismiss in the New York case was not relevant here, because Defendants are "not challenging the entitlement of Xavian's actuarial and ratings analyses to trade secret protection"). But because their opening and reply briefs suggest otherwise, the Court addresses those arguments here.

11

A.  **"Reasonable measures" to maintain secrecy**

Defendants contend that Xavian did not take reasonable measures to keep its information secret, having shared only the "*existence* of a Plan B" (but no details) during the PIA's term and with no indication that BCC was required to treat it as confidential. Defendants are correct that a failure to take such measures "forfeits any protection." *Fail-Safe, LLC v. A.O. Smith Corp.*, 674 F.3d 889, 893 (7th Cir. 2012). But Defendants' argument assumes that the development of a consortium alone was the impetus of Xavian's lawsuit, and that Plan B was independent of the actuarial and ratings analyses underlying Xavian's original business plan—a position that, as discussed, flies in the face of the amended complaint. *See, e.g.*, R. 44 ¶ 45 ("Plan B . . . contemplated the potential use (subject to appropriate confidentiality agreements) of Xavian's same trade secret data to educate the insurance market and form a consortium of large insurance companies to offer the private, insurance-based guarantee." (emphasis in original)); *id.* ("Plan B . . . depended on the ability to use the underlying trade secret data that Xavian had already developed").

And those analyses were certainly protected. The PIA covered written information disclosed by either party to the other to the extent marked as proprietary or confidential when received. R. 44, Ex. 1 at 1. Xavian's actuarial and ratings analyses were appended to its business plan. That plan was distributed to BCC within the term of the PIA and plainly marked "confidential." *Id.* ¶¶ 39-40, 45 ("Xavian disclosed its business plan and attachments to BCC under the protection of the [PIA], and that protected information provided Boeing with the proprietary data

and analysis necessary to form the AFIC consortium."). BCC's confidentiality obligations as to information shared during the PIA's term (including the actuarial and ratings analyses) continued after the PIA's expiration. *Id.*, Ex. 1 at 2. This is enough to allow Xavian's claims to proceed to discovery. *See Gen. Elec. Co.v. Uptake Technologies, Inc.*, 2019 WL 2601351, at *8 (N.D. Ill. June 25, 2019) (trade secrets claim "pass[ed] Rule 12(b)(6) muster" where it alleged that those given access to sensitive information were required to sign a confidentiality agreement, and plaintiff marked its documents as confidential); *see also Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 922 (N.D. Ill. 2016) (plaintiff "made reasonable efforts to maintain the information's secrecy and confidentiality by entering into the detailed Confidentiality and Non-Disclosure Agreement"). Defendants' "reasonable measures" argument also fails.[4]

B.  **Staleness**

Defendants also argue that Xavian's 2008 actuarial and ratings analyses were stale by the time Boeing and Marsh allegedly used them in 2015. But that's a question of fact that is not proper to resolve on a motion to dismiss. *See Xavian Ins. Co. v. Marsh & McLennan Cos., Inc.*, 2019 WL 1620754, at *6 (S.D.N.Y. Apr. 16, 2019) ("whether the actuarial analysis that constitutes one component of Xavian's asserted Trade Secrets is stale . . . may not be resolved on a motion to dismiss"); *see also*

---

[4] Any contention that the parties' discussions in 2011 (outside the term of the PIA) destroyed the trade secret status of Xavian's actuarial and ratings analyses is belied by the PIA itself, which requires only that a party seeking to protect information as proprietary and/or confidential designate it as such *when initially disclosed*—a designation which, as explained, was made here.

13

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) ("The question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder" (internal citations omitted)).[5]

Further, such a contention is belied by the amended complaint, which makes clear that BCC inquired about "resurrecting" Plan B as recently as June 2015—an inquiry occurring simultaneously with news of the Ex-Im Bank's impending demise. R. 44 ¶¶ 48, 49 and Ex. 2. Far from industry changes and the passage of time rendering Xavian's analyses obsolete as Defendants contend, the amended complaint plausibly suggests that the demand for Xavian's trade secrets only grew because the only public financing option had been eliminated, and a private option had yet to emerge.[6]

---

[5] The cases Defendants rely upon do not hold otherwise; indeed, each was decided following a hearing or discovery on the issue of staleness. *See Applied Indus. Materials Corp. v. Brantjes*, 891 F. Supp. 432, 439 (N.D. Ill. Dec. 13, 1994) (denying preliminary injunction following a hearing where plaintiff could not establish likelihood of success on the merits due to age of the profit margin information at issue and annual fluctuations in those margins); *see also UTStarcom, Inc. v. Starent Network Corp.*, 675 F. Supp. 2d 854, 872 (N.D. Ill. 2009) (denying plaintiff's request to designate documents as "trade secrets" for "'staleness' reasons alone" because plaintiff did not present any evidence suggesting the documents retained value); *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700 (N.D. Ill. 2010) (denying preliminary injunction to enforce non-competition agreement where employer conceded that any information employee possessed was stale).

[6] Xavian also argues that according to the amended complaint, there was no 7-year gap between the disclosure of Xavian's trade secrets and Defendants use as Defendants contend, because not only did Defendants receive Xavian trade secrets directly from Xavian between 2007 and 2009, but also Defendants received them through former Xavian team member Morin and through Xavian insurance broker Marsh more recently. *See* R. 44 ¶ 28 (noting that Morin had access to "almost all" of Xavian's trade secrets); *id.* ¶¶ 43-44 (alleging that Marsh acquired Xavian trade

* * * * *

In sum, the amended complaint plausibly alleges that: (1) Xavian developed the actuarial and ratings analyses necessary to provide a private, all-risk export credit guarantee for aircraft loans to foreign airlines with below investment grade credit; (2) Xavian provided that information to BCC after designating it as confidential during the term of the parties' PIA; and (3) Defendants could not have developed the AFIC—similar to Xavian's "Plan B"—without using Xavian's actuarial and ratings analyses. This is more than enough to survive Defendants' motion, which is denied.

## Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss. R. 50.

ENTERED:

*[signature: Thomas M Durkin]*

Honorable Thomas M. Durkin
United States District Judge

Dated: September 30, 2019

---

secrets in 2010 and 2011). But because the Court concludes that Xavian states a claim even absent such allegations, it does not consider them here.